403 So.2d 856 (1981)
Gladys Mae Pitre BOAGNI, Widow of Vincent Boagni, Sr., et al., consolidated with Estate of Gladys Mae Boagni Waterbury (No. 14,381), and Estate of Gladys Mae Boagni Waterbury (No. 14,553) Plaintiff-Appellant,
v.
Robert L. WATERBURY, Defendant-Appellee.
No. 8090.
Court of Appeal of Louisiana, Third Circuit.
September 2, 1981.
*857 Fontenot & Hurlburt, J. Winston Fontenot, Lafayette, and Albert J. Boudreaux, Opelousas, for plaintiff-appellant.
Carl W. Cleveland and Barbara T. Casteix, New Orleans, Ledet & Gaudin, Stephen J. Ledet, Jr., Opelousas, for defendants-appellees.
Before DOMENGEAUX, STOKER and DOUCET, JJ.
DOUCET, Judge.
Gladys Mae Boagni Waterbury died in Opelousas, Louisiana on February 15, 1968, leaving no descendants. Following her death, a dispute arose between her husband, Robert L. Waterbury, and her mother, Mrs. Gladys P. Boagni, over the disposition of the assets of her succession. As a result of that conflict, three separate suits were filed in the district court and consolidated for trial.
The issues raised by this appeal concern only the third suit, Number 56,292 on the docket of the district court, which was originally brought by Mrs. Boagni and the decedent's brothers, Vincent Boagni, Jr. and Christopher D. Boagni. The petitions of the decedent's brothers were later dismissed by the trial judge, however, after he sustained exceptions of no cause of right of action filed by the defendants to that suit, *858 Robert L. Waterbury, Dolores Waterbury Danner, and William B. Waterbury.[1]
This is primarily a suit en declaration de simulation. The transactions attacked are three sales of land by Robert Waterbury to his sister, Dolores W. Danner, and certain sales and leases entered into by Robert Waterbury, as vendor and lessor, and his brother, William B. Waterbury, as vendee and lessee. In addition, plaintiff seeks a declaration that the community of acquets and gains formerly existing between Robert Waterbury and the decedent is indebted to the decedent's separate estate in the sum of $200,000.00, the amount derived from an expropriation of the decedent's paraphernal property.
Following a trial on the merits, judgment was rendered in favor of the defendants and against plaintiff, rejecting her demands at her cost. From that judgment, plaintiff appeals.
On appeal, plaintiff argues that the trial judge erred in (1) admitting into evidence uncertified copies of the defendants' income tax returns; (2) failing to require the defendants to prove the reality of the contested transactions after she had shown the existence of a number of suspicious circumstances surrounding them; and (3) failing to recognize that the community of acquets and gains formerly existing between Robert Waterbury and the decedent is indebted to the decedent's separate estate in the sum of $200,000.00.

ADMISSION OF THE INCOME TAX RETURNS
Plaintiff's contention that the trial judge erred in admitting copies of Robert Waterbury's and Dolores Danner's income tax returns is based on the "best evidence" rule. See Breaux v. Laird, 230 La. 221, 88 So.2d 33 (1956); Al Smith's Plumbing & Heating Service, Inc. v. River Crest, Inc., 365 So.2d 1122 (La.App. 4th Cir. 1978); Raceland Stockyards, Inc. v. Giaise, 352 So.2d 392 (La.App. 4th Cir. 1977); and Auto-For-Rent, Inc. v. Provenza, 242 So.2d 353 (La.App. 2nd Cir. 1970). Plaintiff argues that the best evidence under the circumstances would have been copies certified by the Internal Revenue Service as duplicates of the original returns filed with that agency.
We are inclined to agree with plaintiff's contention that the copies that were introduced were not the best evidence available, at least insofar as they are proof of the fact that the defendants actually reported the income reflected therein.[2] However, we note that Robert Waterbury and Dillon E. Danner (Dolores Danner's husband, who prepared and filed joint returns for Mrs. Danner and himself) were allowed to testify without objection that they had in fact reported the income shown on those copies. In view of the fact that there was other admissible evidence of the fact sought to be proved, we find that plaintiff has failed to demonstrate that she was harmed by the trial judge's decision to admit the copies into evidence. We therefore see no need for remanding this case to the district court for the substitution of certified copies of the returns as suggested by counsel for plaintiff in his brief.

BURDEN OF PROOF
The general rule is that the party alleging a simulation has the burden of establishing it with a reasonable certainty. D'Angelo v. Nicolosi, 183 La. 1039, 165 So. 193 (1936). In some cases, however, the plaintiff is aided by the existence of a legal presumption of simulation, which has the *859 effect of shifting the burden to the defendants to establish the validity of the transactions under attack.
This presumption of simulation arises in two manners. The first occurs when a seller remains in possession of the thing he sells, either under a precarious title, or by reserving the usufruct of the thing. LSA-C.C. Art. 2480; Ingram v. Freeman, 326 So.2d 565 (La.App. 3rd Cir. 1976), and the cases cited therein. The second occurs when the party alleging the simulation produces evidence of circumstances which create a highly reasonable doubt or suspicion about the honesty or validity of the transaction. Smith v. Smith, 239 La. 688, 119 So.2d 827 (1960); Ingram v. Freeman, supra, and the cases cited therein.
Plaintiff claims the benefit of the presumption and argues that the trial judge erred in failing to require the defendants to establish the validity of the contested transactions. After reviewing the evidence in the record and the trial judge's written reasons for judgment, we find no merit in that argument. We agree with plaintiff's contention that the presumption applies. However, we find that the trial judge concluded that the defendants had succeeded in establishing the validity of the transactions, and for reasons which will be set out in greater detail in the following discussion of the evidence, we cannot say that he was clearly wrong in doing so.

FACTS
All but one of the transactions that are attacked by plaintiff involved property belonging to the community of property formerly existing between Robert Waterbury and the decedent. In entering into the transaction involving the decedent's paraphernal property, Robert Waterbury acted under a power of attorney issued by the decedent in 1955; in the other transactions, he acted as head and master of the community. The following is a list of those transactions:
Exhibit B Assignment of an oil and gas lease to William B. Waterbury for $12,000.00 on October 10, 1967
Exhibit C Sale of 38.2 acres to Dolores W. Danner for $7,640.00 cash on December 15, 1967
Exhibit D Sale of 2.08 acres to Dolores W. Danner for $416.00 cash on December 15, 1967
Exhibit E Sale of 184.25 acres to Dolores W. Danner for $13,818.75 cash on December 15, 1967
Exhibit F Sale of 101.32 acres to William B. Waterbury for $15,198.00 cash on December 15, 1967
Exhibit G Sale of movables to William B. Waterbury for $10,000.00 cash on January 2, 1968
Exhibit H Surface lease of 325.03 acres to William B. Waterbury for $1,512.96 per annum for 10 years commencing January 2, 1968. (The property was the decedent's paraphernal property)
Exhibit N Sale back from William B. Waterbury to Robert Waterbury of 101.32 acres (Exhibit F, above) for $20,640.00 cash on December 30, 1974
In the case of the three sales of land to Dolores W. Danner (Exhibits B, C and D, above), there is no question about the fact that the presumption of simulation arising under LSA-C.C. Art. 2480 applies, because Robert Waterbury remained in possession of the property after the date of the sales. There was some dispute about whether he also retained possession of the property sold to William B. Waterbury. However, the trial judge found that William B. Waterbury had gone into possession of the property, and that finding is not clearly wrong. Nevertheless, plaintiff argues that the presumption of simulation applies to all of the above transactions, because a number of suspicious circumstances create a highly reasonable doubt about their validity.
We will not attempt to enumerate all of the suspicious circumstances alleged by plaintiff. We find little support in the record for some of them, and we attach no significance to others. We believe, however, that the following circumstances asserted by plaintiff are worthy of mention:
*860 1. The decedent was terminally ill and in a coma when the transactions took place.
2. There was no apparent need for the alienations of property.
3. Robert Waterbury failed to account for the proceeds of the sales and leases.
4. Cash was used.
5. Robert Waterbury retained possession of the property sold to Dolores W. Danner.
6. William B. Waterbury sold some of the property that he purchased back to Robert Waterbury after the decedent's death.
Whether or not the decedent was actually comatose when the disputed transactions took place is not entirely clear. However, there is no dispute about the fact that she was extremely ill and generally incapacitated the last year or so of her life. She was hospitalized in New Orleans, Louisiana for a time, after which Robert Waterbury set up a clinic in their home to care for her. In addition to procuring all of the necessary medical equipment, including life support equipment, an auxiliary generator and some laboratory equipment, he hired a number of local nurses to provide bedside care 24 hours per day and a professional nurse from New Orleans to supervise them.
Mr. Waterbury maintained the clinic in his home at considerable expense from September of 1967, shortly before the disputed transactions took place, until the decedent's death in February of 1968. Mr. Waterbury testified that the sales and leases were a necessary means of generating the funds needed to meet the extraordinary expenses that were incurred in that five month period. He further testified that out of the roughly $60,000.00 that was derived from those transactions, approximately $22,000.00 remained at the decedent's death and was listed as an asset in the succession proceedings, and the balance of $38,000.00 had been spent in caring for the decedent and in maintaining their household and their business operations.
Plaintiff attempted to contradict that testimony by showing that the decedent's medical bills had been paid by a Boagni family partnership. However, the only evidence that she produced to support that allegation consisted of a number of cancelled checks that had been issued in the 1950's.
With regard to the consideration for the transactions, the record shows that the cash sales were executed before Seth Lewis, Jr., a notary public and highly respected member of the bar. Mr. Lewis passed away prior to the trial and was therefore unavailable to testify. However, one of the witnesses to the acts, Emily Boudreaux, appeared and testified that she had actually seen the cash change hands.
Mr. and Mrs. Danner testified that Mrs. Danner borrowed $20,000.00 of the cash that she used to purchase the property from her father, William A. Waterbury. Mr. Danner produced a demand note signed by Mrs. Danner and payable to William A. Waterbury in that amount, which was admitted into evidence. The Danners further testified that nothing had ever been paid on the note because Mrs. Danner's parents, who were elderly and in poor health, had no immediate need for the cash, and it was understood that unless it was needed earlier, Mrs. Danner would not have to account for the loan until one of her parents died and their succession was opened.
In a deposition taken prior to his death, William B. Waterbury testified that he acquired the cash that he used to purchase the property through various business dealings related to the oil and gas industry. He testified that he worked for several different companies as a drilling consultant and that he made additional money by buying and selling used drilling equipment. He further testified that he customarily carried large amounts of cash because it enabled him to purchase used drilling equipment at discounted prices from companies that were leaving a drilling site and moving to another area. His testimony that he frequently dealt in cash was corroborated by his brother and by his wife, Gertrude Flesner Waterbury, *861 who testified that although she knew very little about his business dealings, she was aware of the fact that he sometimes used large amounts of cash, and on one occasion, following the sale of their home in Baton Rouge, she saw a substantial quantity of it in his possession.
With regard to Robert Waterbury's continued possession of the property sold to Mrs. Danner, Mr. Waterbury and the Danners testified that he used the property pursuant to a surface lease granted by Mrs. Danner. According to their testimony, the consideration for the lease was Mr. Waterbury's agreement to pay the property taxes when due and maintain the land for agricultural and grazing purposes by repairing fences, fertilizing, etc. Other evidence established that the amount that Mr. Waterbury claims to have expended in fulfillment of those obligations was commensurate with the rent that plaintiff charged her son, Christopher Boagni, under a surface lease of similar property.
The final circumstance asserted by plaintiff, the retrocession of the 101.32 acre tract sold to William B. Waterbury, plaintiff considers to be the most suspicious. The trial judge disagreed with that conclusion, finding that in effecting the transfer there was a settlement of accounts between the brothers, which indirectly confirmed the earlier sale. The finding is supported by the fact that part of the consideration for the sale back to Robert Waterbury was the retirement of a demand note that William Waterbury had executed in his brother's favor at an earlier time.
Although the trial judge didn't articulate his evaluations of credibility, we believe that his acceptance of the defendants' testimony is implicit in his written reasons for judgment. After carefully scrutinizing that testimony and the accompanying documentary evidence, we cannot say that he was clearly wrong in doing so. The defendants' explanations of the unusual circumstances surrounding the transactions were not so implausible or unlikely as to be beyond reasonable belief. Since their testimony together with the other evidence in the record furnishes a reasonable factual basis for the trial judge's finding that the transactions were real and not simulations, we are not free to disturb that finding under the standard of appellate review set out by our Supreme Court in Canter v. Koehring Co., 283 So.2d 716 (La.1973) and further explained in Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Accordingly, the trial judge's refusal to declare the disputed transactions simulations is affirmed.

RESTITUTION OF PARAPHERNAL PROPERTY
The legal principles governing plaintiff's claim for restitution of the decedent's paraphernal funds were recently set out in this court's opinion in Succession of Vice, 385 So.2d 554 (La.App. 3rd Cir. 1980) as follows:
"Our jurisprudence is established that:
`... when large sums of community funds are commingled indiscriminately with separate funds, to the extent that the separate funds are no longer capable of identification, all of the commingled funds become community property. Succession of Land, 212 La. 103, 31 So.2d 609; Magnolia Petroleum Co. v. Crigler, 12 So.2d 511 (La.App.); Bruyninckx v. Woodward, 217 La. 736, 47 So.2d 478; Slater v. Culpepper, 233 La. 1071, 99 So.2d 348.'
"A wife is entitled to restitution of her separate property at the time of dissolution of the community if the funds delivered by the wife to the husband and commingled with community funds can be traced to her separate funds or if the benefit to the community is established with reasonable certainty. Guilott v. Guilott, 326 So.2d 551 (La.App. 3rd Cir. 1976). In the absence of compelling proof that a strong and substantial economic advantage inured to the benefit of the community, the wife's restitution claim will be denied. Succession of Russo, 246 So.2d 26 (La.App. 4th Cir. 1971), writs refused, 258 La. 760, 247 So.2d 861."
Plaintiff presented documentary evidence establishing that in 1961 the decedent received *862 approximately $200,000.00 as a result of an expropriation of her separate property. The only other evidence relevant to this issue was Robert Waterbury's testimony that after paying approximately $40,000.00 in legal and expert witness fees, the balance of the award was deposited in a joint community checking account and later withdrawn by both him and the decedent for various purposes. The trial court concluded that that evidence was not sufficient to determine whether restitution was owing. Acting pursuant to LSA-C.C.P. Art. 1631, he allowed the parties sixty days to determine if they wished to produce additional evidence limited to the issue of plaintiff's claim for restitution. Neither party availed themselves of that opportunity, as a result of which the trial court rendered judgment denying plaintiff's claim.
We find no error in that ruling. Under the legal principles set out above, the evidence produced by plaintiff is clearly lacking. At the time of the decedent's death, all but about $5,000.00 of the commingled funds in their joint checking account had been withdrawn. The evidence provides no basis for determining what if any portion of the decedent's separate funds, which both Mr. Waterbury and the decedent had access to, inured to the benefit of the community. Under those circumstances, the trial court correctly refused to declare that the community is indebted to the decedent's separate estate.
For the above and foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are assessed against the plaintiff-appellant.
AFFIRMED.
NOTES
[1] William B. Waterbury died prior to the trial. His widow, Gertrude Flesner Waterbury, and his children, Tricia Waterbury Deffes, Janine Waterbury Rozas, Meda Marie Waterbury, Dawna Dee Waterbury and Rebecca Renee Waterbury, were substituted as defendants.
[2] This conclusion would not necessarily apply to cases in which copies of income tax returns were offered as proof of some circumstance collateral to the issue of whether income was reported to the taxing authority, such as the amount of a person's income for a given year. See Joseph Durst Corp. v. Coastal Development Co., 177 So.2d 123 (La.App. 3rd Cir. 1965), writ refused 248 La. 420, 179 So.2d 17 (1965).