NASCO, INC.

v.

**CALCASIEU TELEVISION AND RA-
DIO, INC.; G. Russell Chambers
and Mabel Christine Baker.**

**Civ. A. No. 83–2564.**

United States District Court,
W.D. Louisiana,
Lake Charles Division.

Nov. 8, 1985.

See also 5 Cir., 752 F.2d 157.

Neal & Harwell (Aubrey B. Harwell, Jr., and Jon D. Ross), Nashville, Tenn., Scofield, Bergstedt, Gerard, Mount & Veron (John B. Scofield and David L. Hoskins), Lake Charles, La., for plaintiff.

Arnall, Golden & Gregory (Jonathan Golden), Atlanta, Ga., Camp, Carmouche, Barsh, Hunter, Gray, Hoffman & Gill (A.J. Gray, III, Gary L. Boland), Lake Charles, La., Baton Rouge, La., Rubin, Curry, Colvin & Joseph (Michael H. Rubin and Richard A. Curry), Baton Rouge, La., for defendants.

## OPINION

NAUMAN S. SCOTT, District Judge.

This is an action for specific performance of a Buy and Sell Agreement (Agreement) executed on August 9, 1983, providing for the sale and purchase of television station KPLC–TV in Lake Charles, Louisiana.

Jurisdiction is found under the provisions of 28 U.S.C. § 1332.

The plaintiff is Nasco, Inc. (Nasco), the prospective purchaser of the station. The defendants are Calcasieu Television and Radio, Inc. (CTR), the owner and prospective seller of the station; G. Russell Chambers (Chambers), the sole shareholder and sole director of CTR, who signed the Agreement on behalf of CTR and in his individual capacity; and Mable Christine Baker (Baker), in her capacity as the Trust-ee of a Facility Trust which is the alleged record owner of certain immovable properties previously owned by CTR and covered by the Agreement. Chambers is Baker's brother, and is the settlor of the Trust of which Baker is Trustee. His three adult children are the beneficiaries.

This matter was tried to the Court without a jury as a suit in equity on April 17, 1985. Prior to trial, Nasco dismissed without prejudice certain claims in contract and in tort, reducing its case in chief to a purely equitable claim for specific performance of the August 9th Agreement and the defenses applicable thereto. By order of the Court, trial was limited solely to those claims, severing all other issues (including damages) for trial at a later date.

Chambers and CTR contend that the remedy of specific performance is no longer available to Nasco because the title of Baker is protected by the Louisiana Public Records doctrine thereby reducing Nasco's remedies to a claim for damages.

## FINDINGS OF FACT

1. On August 9, 1983, Nasco, as buyer, and CTR and Chambers, as sellers, entered into the Agreement to convey the television facilities and the broadcast license of KPLC–TV in Lake Charles, Louisiana for the purchase price of $18 million dollars. The Agreement has never been recorded in Calcasieu and Jefferson Davis Parishes where the properties are located.

2. It is expressly recognized in the Agreement that the Agreement could not be consummated unless and until Federal Communication Commission (FCC) approved the transfer of the KPLC license to Nasco.

Paragraph 6 of the Agreement provides as follows:

"It is specifically understood and agreed that the consummation of this Agreement shall be in all respects subject to the approval of the Commission (Federal Communications Commission—FCC).

Upon execution of the Agreement, *Buyer and Seller shall proceed as expeditiously as practicable to file all requisite applications* and other necessary instruments, and agree thereafter to prosecute said application or applications with all reasonable diligence and otherwise to cooperate with each other and to use their best efforts to obtain the requisite consent and approval promptly and to carry out the provisions of this Agreement. *In no event shall the Application be filed later than forty five (45) days from the date of the Agreement."* (Emphasis ours).

Thus the joint application for transfer of the license was to be filed no later than September 23, 1983.

3. On August 22, 1983 Brian Burns and Jim Smith who had signed the Agreement on behalf of Nasco visited KPLC–TV. This was the only instance on which any representative of Nasco was present at the TV station prior to September 23, 1983. It was during this visit that Rita Guillory, president of CTR, learned for the first time that KPLC–TV was to be sold, and that Chambers had signed the Nasco Agreement of August 9, 1983. The president of CTR had no part in the negotiations leading to the execution of the Agreement; nor was she consulted regarding the Agreement. In fact no officers or employees of the station except Chambers and his lawyers were aware that the Agreement existed.

Up to the time that he left a meeting with Nasco representative on August 22, 1983, Chambers and CTR had been cooperative in carrying out the Agreement.

4. On August 28, 1983 Chambers' application for a 3½ million dollar bond issue was rescinded or refused. Although the bond issue had no relationship to the performance of the Agreement, Chambers continuously referred to this failed bond issue as a basis for delaying the submission of CTR's portion of the FCC application to transfer the license.

5. Chambers called Bill Cook, chairman of Nasco, on August 29, 1983 and tried to talk him out of going through with the Agreement, offered to reimburse all of Nasco's expenses and pay some additional money. Cook's reply was, "My only interest is in acquiring KPLC–TV." Chambers had demonstrated as early as August 29, 1983 that he desired to avoid performance of the Agreement.

6. On September 2, 1983, Nasco informed CTR and Chambers that Nasco's portion of the Assignment Application was ready and in suitable form for filing with the FCC.

7. On or about September 7, 1983 Chambers had a telephone conversation with Brian Burns in which he referred to the failed bond issue and then asked "What would you say if I didn't file?" Burns replied that Nasco had been ready to file its portion of the FCC application since September 1 or 2, and that he would be very disappointed.

8. Burns and Chambers spoke again on Monday, September 12, 1983. When Chambers asked what Burns thought of Chambers' remark on September 7th, Burns replied that, based on his brief contacts with Chambers, he thought that Chambers would do what the Agreement provided. Chambers answered that he recognized that he (CTR) had a contractual obligation to file CTR's portion of the FCC application.

9. On the next day they spoke again. Chambers, referring again to the lack of any progress in resolving the bond problem, stated that he recognized his obligation but that, if he didn't have an answer to the bond problem by September 23, 1983, he would not file. The bond problem was still entirely unrelated to the Agreement.

10. In a letter (Ex. P2) dated September 16, 1983, Nasco (Brian Burns) refers to the content of the conversations (paragraph 6–9 above) in detail, and again notified CTR and Chambers that the assignee's part of the application had been ready and in suit-

able form for filing since September 2nd and requested that CTR "immediately prepare, have executed and forwarded the assignor's portion of the assignment application prior to September 23, 1983."

Chambers replied on September 21, 1983 (Ex. P3) that the Agreement speaks for itself and that he understood that his "attorney has contacted your attorney." He did not deny any of the content of the September 16, 1983 letter (Ex. P2).

11. On September 23, 1983, Nasco's FCC counsel, John Stewart, was informed by defendants' FCC counsel, Roy Russo, that the assignor's portion of the Application would not be filed on that date. On that same date Stewart caused a letter to be hand delivered to Russo, stating again that Nasco was ready and willing to file the assignee's portion of the Application and that Russo should notify him if and when the assignor's portion was received.

12. From August 9, 1983, the date that the Agreement was executed by the parties, until September 23, 1983, the date by which CTR was to submit its portion of the FCC application, there was no default or violation of the Agreement on the part of Nasco. In fact all parties, including Chambers, were performing and ready to go forward on August 22, 1983. On that date Burns and Smith, representing Nasco, visited the TV station by arrangement with Chambers. Both Chambers, sole member of the Board of CTR, and Rita Guillory, its president who later married Chambers, were present. Chambers, along with the Nasco representatives chose which of several TV announcements should be used to publicize the intended sale. Although Chambers refused to honor Nasco's request for a list of community leaders to be interviewed by Nasco to prepare its portion of the FCC application, no one contested his right or his reasons for doing so.

13. Chambers, for reasons best known to himself, decided at some time between August 22, 1983 and August 29, 1983 that he did not want to go through with the Agreement. When he called Bill Cook on the latter date (see paragraph 5 above) they talked some forty-five minutes. Chambers did not complain of the violation of any pre-August 9, 1983 understanding, any violation of the Agreement, any harassment of station operations or personnel, any difficulty with ascertainment interviews—all of which have been alleged by defendants following the institution of this suit. He simply tried to generate with Cook some terms on which he could buy out of the Agreement. Cook was adamant.

14. In Chambers' conversations and correspondence with Burns after August 29, 1983 he never once alluded to any such breaches by Nasco, he talked only of an unrelated bond problem as the reason for his admitted reluctance to file CTR's portion of the FCC application. Although he admitted that he and CTR were bound by the Agreement (now a stipulated fact), Chambers suggested on September 7, 1983 for the first time that he (CTR) might refuse to file timely his portion of the FCC application (paragraphs 7–10 above). His (CTR's) acts after August 29, 1983 finally culminated in his (CTR's) unjustified and arbitrary refusal to file CTR's portion of the FCC application by September 23, 1983. This refusal was a deliberate violation of their obligations under paragraphs 6 and 31 of the Agreement. Their refusal or failure to file was in absolute bad faith.

15. On Friday, October 14, 1983, counsel for Nasco notified Jonathan Golden, an attorney for Chambers and CTR and an officer of CTR, that it would file suit in the United States District Court for the Western District of Louisiana in Alexandria, Louisiana on Monday, October 17, 1983, seeking appropriate relief for breach of contract and that counsel for Nasco would appear in Alexandria at approximately noon on that date to request injunctive relief to preserve the status quo by enjoining the alienation or encumbrance of the subject properties until a judicial resolution of the dispute could be obtained. This in-

formation was transmitted to Chambers through his Lake Charles attorneys.

This notice was given to the defendants Chambers and CTR pursuant to the requirements of Fed.R.Civ.P. Rule 65(b) and Rule 11 of the Local Rules of this Court which are designed to give notice to a defendant in an application for a temporary restraining order so that he may be present at the hearing and defend his interest. Chambers and his attorneys took advantage of this notice to send into motion a scheme which they have freely admitted was designed to place certain CTR properties beyond the reach and jurisdiction of this court through the medium of the Louisiana Public Records Doctrine and deprive Nasco of a judicial determination of its rights to specific performance and still maintain CTR in possession and in a position to continue its operations without interruption.

16. Taking advantage of this notice, Chambers arranged a meeting with his Lake Charles attorneys at some time between two and six p.m. on Sunday, October 16, 1983. The attorneys prepared and Chambers executed an act of donation in trust with a corpus of $1,000.00; appointing Chambers' sister, Baker, as Trustee and naming Chambers' three adult children as beneficiaries. Both Chambers and Rita Guillory (now Mrs. Chambers) were fully aware on October 16, 1983 that the two tracts of land on which the TV station and the transmitter were located were to be sold to Nasco under the agreement of August 9th. Yet, contemporaneously with the drafting of the Trust, Chambers, the sole member of the Board of Directors and the sole stockholder of CTR, directed Rita Guillory, the President of CTR, to execute Warranty Deeds conveying the two tracts to Baker, Trustee, for a recited consideration of $1.4 million dollars represented by an unexecuted note in that amount. The president of CTR complied, as directed.

17. On the evening of Sunday, October 16, 1983, Chambers phoned his sister, Baker, and informed her of the creation of the Trust and that it was his wish that she act as Trustee. He did not refer to the duplicate deeds which had been executed by Rita Guillory on behalf of CTR. After she consented to be Trustee, Chambers told Baker that he would be coming to Birmingham, Alabama the next day to have her sign some documents.

18. The deeds were recorded at 8:30 a.m. on Monday, October 17, 1983; with none of the consideration having been paid, with the note still unsigned, and with CTR still in undisturbed possession despite the recordation of the credit sale deeds. All this was accomplished at the sole direction of Chambers.

19. Late on the morning of Monday, October 17, 1983, Nasco's counsel appeared before us in Alexandria and filed its complaint against CTR and Chambers seeking as part of the relief against those parties specific performance of the Agreement and a Temporary Restraining Order (TRO) to enjoin those parties from alienating or encumbering the properties covered by the Agreement. Mr. Gray, one of the Lake Charles counsel for CTR and Chambers, had requested by a telephone call to the Clerk of Court's office that morning that he be informed when Nasco's counsel arrived. We personally called Mr. Gray, informed him that Nasco's counsel had stated to us that notice had been given of the injunctive relief sought by Nasco and that they could not account for Mr. Gray's absence. Mr. Gray did not plead surprise or lack of notice. Had he done so, we, considering the substance of the relief sought, would have delayed action until Mr. Gray could be present. This was not considered, however, because Mr. Gray stated that he did not intend to be present and that he was making no statements or representations on behalf of his client. However, he did participate fully in the conference. We informed him of the nature of the injunctive relief sought, read to him verbatim, the Order suggested by Nasco and solicited

comment from him. After further discussion with Mr. Gray and counsel for Nasco, alterations in the Order were agreed upon and the Order, incorporating these alterations, was signed by us at 1:34 p.m. A hearing for a preliminary injunction was set for October 24, 1983. Mr. Gray participated in the TRO conference by telephone as fully as he could have done if personally present, and was fully aware of the fact that the TRO was signed by us on or about 1:34 p.m. Although Mr. Gray, during this discussion, was then deeply involved in Chambers' scheme to place the property beyond the reach and jurisdiction of this Court, he made no mention of this to the Court. Exhibit P. 10.

20. At or about 4:30 on the afternoon of Monday, October 17, 1983, after the deeds had been recorded, and after the order had been signed in Alexandria, Chambers flew to Birmingham, Alabama and met Baker at the airport. He directed her to sign the trust agreement and the $1.4 million note to CTR. She did as directed. She does not recall being told about the sale or receiving a copy of it. She signed the note without knowledge of why she was signing, what it was for, or how she was going to pay it. The corpus of the trust at that time was $1,000. Baker was given no explanation and she did not ask for any.

21. On Tuesday, October 18, 1983, the Lake Charles counsel for CTR and Chambers admitted by letter that they had recorded the duplicate deeds at 8:30 a.m. on Monday, October 17, 1983 and that they intentionally concealed that fact from the Court prior to and during the issuance of the TRO.

22. On Monday, October 24, 1983, we granted a preliminary injunction against CTR and Chambers, and entered a second temporary restraining order directed against Baker to prevent her from selling, transferring, or in anyway encumbering the CTR properties. Mr. Gray appeared as counsel for CTR and Chambers but denied representation of Baker. Nasco's counsel,

having assumed Mr. Gray would represent her, then made attempts to contact Baker prior to the Court's issuance of the order. Failing such notice, the Court, in the interest of justice, granted such TRO against Baker, as trustee of the Facility Trust at 10:37 a.m. on October 24, 1983.

23. Chambers caused his Lake Charles attorneys to prepare a leaseback agreement from Baker, trustee, to CTR covering the same properties allegedly conveyed to Baker in the duplicate deeds of October 16, 1983. Rita Guillory signed this instrument on behalf of CTR on October 22, 1983 and forwarded it to Baker, directing her to sign and return. Baker had no notice or other reason to expect the receipt of this lease. Baker knew nothing of its terms or contents and she had no part in any negotiations. No explanation accompanied the lease; Baker had no conversation or advice with Rita Guillory, Chambers or anyone else. She simply signed and returned the lease on October 25, 1983. It is not shown in the record, even at this late date, that Baker was aware of the October 16, 1983 "sale" from CTR or the identity of the property covered by that "sale."

24. We find as a matter of fact that CTR, from a date prior to August 9, 1983, was in complete control of Chambers; that the Fidelity Trust, from the time of its inception on Sunday, October 16, 1983 and the Trustee Baker from the time of her acceptance on or about 5:15 p.m. on Monday, October 17, 1983 also were controlled completely by Chambers. This finding is based on the evidence as a whole and particularly on the following uncontroverted facts:

a. The Agreement was consummated and executed on August 9, 1983. Chambers was the sole and only participant and negotiator on behalf of CTR and himself. No other officer or employee of CTR, with the exception of Jonathan Golden, Chambers' attorney in these negotiations who was also a CTR assistant secretary, was aware that a sale of CTR properties was

contemplated or that an agreement to sell had been consummated.

b. Chambers, and Chambers ·alone, determined at some time prior to September 23, 1983 that CTR would not file its portion of the FCC application and that CTR has continued this refusal.

c. Chambers, and Chambers alone, determined that the CTR station and transmission properties should be sold. No corporate advantage or benefit to CTR has been disclosed or demonstrated in the sale-leaseback arrangement. Not only did he direct CTR to make the sale, he created a purchaser, the Trust, controlled entirely by him through Baker, to whom the properties were sold. He furnished the consideration to be used by the Trustee to pay for the properties in the form of rental under a lease which enabled him to maintain actual possession in CTR.

d. The duplicate acts of sale were drafted at the direction of Chambers. He specified which CTR properties were to be sold. He alone determined the amount of consideration to be paid.

e. The Trust was created by Chambers' Lake Charles attorneys at Chambers' direction. He determined the terms and conditions of the Trust, the life of the Trust, the beneficiaries, the corpus, the identity and powers of the Trustee. All of this had been done and Chambers had executed the Trust instrument prior to Chambers' telephone call to Baker at about 8:00 p.m. on Sunday, October 16, 1983 in which he sought and received her consent to become Trustee of the Trust.

f. The deed to Baker was signed by Rita Guillory on behalf of CTR between 2:00 p.m. and 6:00 p.m. on Sunday, October 16, 1983 as directed by Chambers. The president, Rita Guillory, signed the duplicate deeds simply because she had been directed by resolution of the sole director, Chambers, to do so. Neither she nor Chambers could have negotiated the sale with Baker as trustee because the Trust

did not exist and Baker had no knowledge that a trust was contemplated. Only Chambers knew.

g. When Rita Guillory signed the duplicate deeds conveying title to CTR's station and transmission sites for 1.4 million dollars, she actually received no consideration. She received no cash, no note and there was no Trustee purchaser who could sign such a note, and no money in the trust to pay the note. Nor was there a mortgage or other security to assure payment of the purchase price. CTR's attorneys, knowing all this, had the duplicate deeds recorded at 8:30 a.m. the next day. At the time these deeds were recorded the Trust had total assets of one thousand dollars. At some time after 5:15 p.m. on Monday, October 17, 1983 when the Trustee finally signed the 1.4 million dollar promissory note, the Trust assets still consisted of 1,000 dollars. Actually the monthly rental installments of $14,000 will be insufficient to pay any of the last 120 installments of the note, each of which amounts to $17,735. All of this was known by CTR, by Chambers and by their Lake Charles attorneys and none of it was a matter of concern to any of them. The reason was control. Chambers had absolute control of the Trustee Baker and of CTR.

h. When Baker accepted. the trusteeship, the deed from CTR to her, as Trustee, already had been executed by Rita Guillory on behalf of CTR. In order to accomplish Chambers' scheme, the deed was recorded without Trustee Baker's signature and at 8:30 a.m. Monday, October 17, 1983, prior to any possible consideration of Nasco's application for a TRO. At the time of recordation Baker had not yet become Trustee nor had she signed the note. She did not know that the duplicate deeds existed. . Baker did not know the identity, the location, the accessibility or the extent of the properties; was not familiar with the buildings, improvements or equipment located on the properties; had no knowledge of the titles or value of the properties; had

no knowledge of why it was bought or what she was to do with it; had not initiated or been approached regarding the sale; had no part in choosing the property, no part in negotiating the sale, in setting the price or the method of payment. With no concern regarding her means of payment or the value of the property described in the deeds, she signed a note in favor of CTR for 1.4 million dollars and delivered it, as instructed, to Chambers. Chambers had not mentioned the sale or the note in his telephone conference with her on Sunday night. He gave her no such information or explanation on Monday, October 17, 1983 in Birmingham and she requested none. According to her testimony she signed simply because her brother would not have directed her to do so if he was not going to arrange a means of payment.

i. Chambers caused the Trust to be drawn assigning to Trustee Baker unlimited power to sell:

. . . . .

5.1. *Powers.* The Trustee shall possess the following powers with respect to each trust.

. . . . .

F. *Sale or Other Disposition.* The Trustee may sell, exchange, redeem, mortgage, pledge, lease (as lessor), or otherwise dispose of any productive or unproductive property of the trust estate, at public sale, private sale or otherwise; for cash or other consideration; payable at the time of the disposition or on credit. The lessee may abandon trust property that the Trustee determines does not warrant protection.

. . . . .

Thus Chambers, thru Baker, can revest title of the properties in CTR at such terms and on such considerations as he may choose.

j. The lease provides that CTR shall pay all utility bills and other similar charges, and ad valorem, sales and other taxes and assessments (Para. 3). CTR assumes responsibility for all "basic structural defects in the immovables, to include the foundations, walls, roof, windows and doors ... and all other repairs, not withstanding the provisions of the Louisiana Civil Code to the contrary." (Para. 4). CTR agrees "to defend, indemnify and save Lessor harmless from all claims" for personal injury or property damage occurring on the premises during the term of the lease (Para. 7). CTR is bound to provide and maintain at its expense Fire and Extended Coverage Insurance and Owners', Landlords' and Tenants' Liability Insurance with such coverage and in such amounts as CTR deems appropriate so long as the amounts equal or exceed minimums specified in the lease (Para. 8). Baker does reserve the right to approve the location and design of any exterior sign or the addition by lessee of any improvements to the property. (Para. 14). This reservation is mere window dressing to a lessor who was completely ignorant of the exterior or improvements when the lease was executed and has never visited the premises since. The evidence establishes that it was never intended that Baker would exercise any rights reserved by Chambers to her under the leaseback agreement and that she never has and never will unless directed to do so by Chambers.

The lease is a month to month lease terminable by either party on notice given the other 10 days before the lapse of any month. It can be terminated also at lessor's option upon CTRs failure to perform certain obligations of the lease.

It is quite obvious that Baker is ignorant of the terms of the lease because, in complete violation of her fiduciary responsibilities, she paid from Trust funds in her special account the 1984 ad valorem taxes in the amounts of $6,488.90 to Wayne F. McElween, Sheriff & Tax Collector (of Calcasieu Parish); $2,664.35 to City of Lake Charles and $6,276.04 to Dallas Cormier,

Sheriff and Ex Officio Tax Collector (Jefferson Davis Parish). CTR was obligated under the provisions of the lease (Para. 3) to pay this $15,429.29 and Baker has never protested CTR's failure to do so or demanded reimbursement from CTR. She is personally liable to the beneficiaries for the payment of this $15,429.29 from Trust funds.

k. Baker, in all her acts, was under the complete control of Chambers. She performed without question or inquiry every act which he instructed her to perform. In fact every discretionary act performed by her as Trustee, except routine ministerial acts like paying bills, was programmed by Chambers. All she had to do was sign. Several remarks in her testimony are especially enlightening:

"Q: So you don't remember when you first saw the deeds?

"A: No, sir, I don't right now.

"Q: The one million four hundred thousand dollars, you had nothing to do with fixing that price of course?

"A: No, sir.

"Q: And if Mr. Chambers had put on that deed two million dollars or ten million dollars, that would have been okay with you?

"A: I would have accepted it. I would have assumed that he knew what he was doing.

"A: So you, Mabel Christine Baker, had no input in fixing the price?

"A: No, sir.

"Q: And you had no input in determining what property would be included in the deed, did you, ma'am?

"A: No, sir.

"Q: In other words, it could have been property in Alabama or property in Freeport, Texas?

"A: No, my brother wouldn't do that.

"Q: Well, no, as long as he owned it?

"A: Uh-huh, that's right.

"Q: But it didn't matter to you what the property was was my question; is that correct?

"A: If that property was to be for a trust fund for his children, then I was willing to accept.

"Q: Sure, But my question is, as long as Mr. Chambers decided that the property—whatever property he decided would go into the deed, that was all right with you?

"A: If it were legal. (Tr. pp. 41–42)

.     .     .     .     .

"Q: I understand. But the point is, at the time of the signing of the trust and the note and the acceptance of the deeds or whatever, you didn't know how many acres were involved at that time?

"A: Well, I figured that my brother knew and that he—when he asked if I would do it and I accepted what he had to say about it. (Tr. p. 44)

.     .     .     .     .

"Q: And when you signed the note for one million four hundred thousand dollars, you did not ask Mr. Chambers, Russ, how am I going to pay this note?

"A: No, sir, I didn't. Because I figure that he would not have his sister or would not ask her to be a trustee of a trust without making some provisions to handle the situation." (Tr. p. 46)

.     .     .     .     .

"Q: Who made the decision to lease that property to the television station?

"A: I would have no way of knowing unless it came from Mr. Chambers.

"Q: I see. In other words, Mr. Chambers—

"A: If he set up the trust, I would suppose he'd lease the property.

"Q: Now, Mr. Chambers or Mrs. Chambers or somebody representing

them sent this lease to you and said, Mabel, please sign it?

"A: The lease was sent to me, there was a note that says sign, and that was no—and no explanation.

"Q: And who sent that note?

"A: That came from Ms. Guillory at that time.

"Q: And it simply said sign this?

"A: Right.

"Q: Did it say anything about sending it back?

"A: I read it—and returned. And I read it, had it notorized, and returned.

"Q: You didn't call Ms. Guillory to find out any more about it? It didn't concern you?

"A: Yes, it concerned me. But I didn't get any call for any explanation. You know, sometimes you feel like that if you are put in a position of a trust, that you should try to handle things yourself whether you make mistakes or not. So I tried to handle this myself." (Tr. pp. 47–48)

We find that Baker has exhibited no discretion of her own, that she has shown no fiduciary responsibility in her acts as trustee. She will perform any act or acts directed by Chambers without question and without any consideration of why. She feels that the trust corpus is his property for his children and she should do exactly what he directs.

25. The duplicate deeds were modeled after the ordinary formulary forms [1] with several alterations or lack of alterations, which might be significant since the deeds were signed only by the vendor, CTR.

a. It was not an authentic act, but a private act duly acknowledged.

b. The usual title "CASH SALE" is changed to "WARRANTY DEED".

c. Although possession of the property was not delivered to the alleged purchaser at the time of execution of the deeds or at the time of recordation the word "DELIVER" was not deleted from context of "GRANT, BARGAIN, SELL, ASSIGN, CONVEY AND DELIVER".

d. The deed states: "This sale is made for and in consideration of the sum of ONE MILLION FOUR HUNDRED THOUSAND AND NO/100 ($1,400,000.00) DOLLARS".

e. The recitation of consideration is always followed by the words "cash in hand paid, receipt of which is hereby acknowledged" or words of similar effect.

f. Where, as here, a note was received, the consideration must be described as a note and the sale is then a credit sale.

g. We find, as a matter of fact, that these alterations in the duplicate deeds were made at the direction of Chambers deliberately and for the purpose of deceiving those members of the public relying on the public records that the property had been delivered to the purchaser and that the consideration had been paid in cash, when in fact there was no delivery or consideration.

26. Chambers and CTR had notice on Sunday, October 16, 1983 of Nasco's intent to file its complaint against Chambers and CTR seeking specific performance of the Agreement and a TRO to preserve the status quo. They knew that a hearing in Alexandria on the TRO application was set for the late morning or noon on Monday, October 17, 1983. This knowledge precipitated the implementation of a plan previously devised by Chambers, CTR and their Lake Charles counsel, to place the CTR properties on which the TV station and the transmission facilities are located beyond the reach and jurisdiction of the court and contemporaneously therewith to retain such properties in possession of CTR for its continued operations and control.

---

1. A Basic Louisiana Notary Guide by James D. Johnson, Jr.; Louisiana Notarial Manual by M. Truman Woodward, Jr.; Louisiana Civil Practice Forms by Roger M. Denton.

27. The sole and only reason for the creation of the trust on October 16, 1983 was the implementation of the plan to prevent specific performance of the Agreement and to continue CTR in possession of the property. If, as Chambers testified, he had previously mentioned such a trust to others, had sought legal advice, why had he not confected the trust before? What changed the situation now to make it more attractive to him on a Sunday, the eve of the TRO conference? He admitted that he had other properties more appropriate to put in trust. Why did it have to be done so hastily? We find that under the circumstances here, no trust would have been made and no property "transferred" if Chambers (CTR) had not previously been informed that Nasco would file this suit the next day.

## CONCLUSIONS OF LAW

1. Notice, under the facts in this case, is not an issue. Mr. Gray, counsel for Chambers and CTR, participated in the Alexandria hearing by telephone and as fully as if he were present. He was informed in detail and was certainly aware of the relief sought; the proffered temporary restraining order was read to him verbatim; the modifications suggested by him were considered and adopted. His participation on behalf of his clients waived any need for notice. The temporary restraining order issued by this court at 1:34 p.m. on October 17, 1983 was legal and valid.

2. We accept defendants' stipulation and find that the Agreement of August 9, 1983 was a valid and enforceable contract as of the date of trial.

3. By virtue of this stipulation, the defendants waived and withdrew all allegations of breaches of the Agreement on the part of Nasco which they previously asserted by way of counterclaims and affirmative defenses, and conceded all facts necessary to the resolution of Nasco's claim for specific performance, reserving for adjudication only the question of the effect of the recordation of the October 16, 1983 conveyance from CTR to Baker, trustee.

4. We accept defendants' stipulation that the failure of Chambers and CTR to file CTR's portion of the FCC application on or before September 23, 1983 constituted a default of the Agreement by Chambers and CTR.

5. Nasco has performed its contractual obligations under the Agreement in good faith and to the fullest extent possible. It has at all times and presently is ready, willing and able to perform its obligations to the completion of the contract.

6. Specific performance:

a. Paragraph 16(a) of the Agreement provides in pertinent part:

"In the event of the failure of Seller to Close the transactions contemplated herein, ... Buyer ... may terminate this Agreement and sue for money damages *or elect to continue this agreement and sue for specific performance and/or damages.*" (emphasis ours)

b. LSA–CC 1986 provides:

"Upon an obligor's failure to perform an obligation to deliver a thing, or not to do an act, or to execute an insrument, the court *shall grant specific performance* plus damages for delay *if the obligee so demands.* If specific performance is impracticable, the court may allow damages to the obligee." (emphasis ours)

Specific performance is the mandatory remedy when demanded by the obligee. Nasco is entitled to such relief as a matter of right; it is not granted simply at the Court's discretion. *J. Weingarten, Inc. v. Northgate Mall, Inc.,* 404 So.2d 896, 900–01 (La.1981); *Bolin Farms v. American Cotten Shippers Ass'n,* 370 F.Supp. 1353, 1360–65 (W.D.La.1974).

This is an action to enforce specific performance of a contract to sell and transfer a TV license and facilities. Federal courts have not hesitated to grant specific performance of such contracts. *Wooster Re-*

*publican Printing Co. v. Channel Seventeen, Inc.,* 682 F.2d 165 (8th Cir.1982) *(per curiam), aff'g Wooster Republican Printing Co. v. Channel 17, Inc.,* 533 F.Supp. 601 (W.D.Mo.1981); *Hawaiian Paradise Park Corp. v. Friendly Broadcasting Co.,* 414 F.2d 750 (9th Cir.1969), *aff'g Friendly Broadcasting Co. v. Hawaiian Paradise Park Corp.,* 282 F.Supp. 464 (D.Hi.1967); *Field v. Golden Triangle Broadcasting, Inc.,* 451 Pa. 410, 305 A.2d 689 (1973); *Times-Journal, Inc. v. Jonquil Broadcasting Co.,* 226 Ga. 673, 177 S.E.2d 64 (1970).

We conclude under these principles that Nasco is entitled to the remedy of specific performance unless that remedy under the facts of this case is impracticable.[2]

7. This Court has full and inherent power to restore the status quo; *Porter v. Lee,* 328 U.S. 246, 96 S.Ct. 1096, 90 L.Ed. 1199 (1946); *Jones v. SEC,* 298 U.S. 1, 56 S.Ct. 654, 80 L.Ed. 1015 (1936); *Texas & New Orleans R.R. Co. v. Northside Belt Ry. Co.,* 276 U.S. 475, 48 S.Ct. 361, 72 L.Ed. 661 (1928); *FTC v. Weyerhauser Co.,* 648 F.2d 739 (D.C.Cir.1981). We have, therefore, the power to restore the status quo in effect at the time that Chambers and CTR became aware that a temporary restraining order would be sought by Nasco on Monday, October 17, 1983. We have found as a matter of fact that they had this knowledge on or before 2:00 p.m. on Sunday, October 16, 1983.

8. Chambers has admitted repeatedly that the trust-sale-lease operation was a deliberate, planned scheme to place the CTR properties beyond the reach and jurisdiction of this Court while maintaining continued and uninterrupted possession of the

properties in CTR. Neither the trust nor the duplicate deeds had been drafted prior to Sunday, October 16, 1983. However, on that date Chambers had full knowledge and notice of the scheduled appearance (noon Monday, October 17, 1983) before this Court to consider NASCO's application for a TRO. This notice was given as required by F.R.Civ.P. Rule 65(b) and Local Rule 11 so that Chambers and CTR might have the opportunity to appear and oppose the application. These defendants have emasculated and frustrated the purposes of these rules and the powers of this Court by utilizing this notice to prevent NASCO's access to the remedy of specific performance.

■ It is also uncontroverted that Mr. Gray, because of his participation in the TRO appearance had full, complete and actual knowledge and notice, as the attorney for Chambers and CTR in this lawsuit, of the issuance of the TRO at about the time it was issued, i.e., 1:34 P.M., Monday, October 17, 1983. In addition, Mr. Scofield, a counsel for NASCO, personally served a copy of the TRO on Mr. Gray at 5:00 P.M. Monday afternoon. The only purpose for Chambers' trip to Birmingham was to complete and perfect the sale of the CTR properties by securing the signature of his sister, Baker, on the trust instrument and on the 1.4 million dollar note. In doing this he was acting on behalf of CTR as well as himself. We hold that where, as in this case, the attorney participated in the TRO appearance on behalf of Chambers and CTR, those parties are bound by the acts of their lawyer agent and are considered to have notice of all facts, notice of which can be charged upon the attorney, F.R.Civ.P.

---

**2.** The defense of impracticability as asserted by the defendants assumes that if the October 16 conveyance cannot be pierced, the Purchase Agreement cannot be specifically enforced.

That assumption is simply wrong.

It has long been recognized, in Louisiana and elsewhere, that where only part of a contract is susceptible of specific performance, a court of equity will specifically enforce that part. *In re Canal Bank & Trust Co.,* 221 La. 184, 59 So.2d

115, 119–20 (La.1952) (per curiam on application for rehearing); *Longino v. Webb Press Co.,* 60 So. 707, 711, 716 (La.1912); *Big State Barging Co. v. Calmes,* 138 F.Supp. 891, 892 & n. 3 (E.D.La.1956). *Cf.* La.Civ.Code art. 2455. Thus, it is clear that Louisiana recognizes and accepts the principle that partial specific performance, with a concomitant reduction in purchase price, may be granted.

65(d); *Smith v. Ayer,* 101 U.S. (11 Otto) 320, 25 L.Ed. 955; *Link v. Wabash R. Co.,* 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962), reh. den., 371 U.S. 873, 83 S.Ct. 115, 9 L.Ed.2d 112; *Orgeron v. Mine Safety Appliances Co.,* 603 F.Supp. 364 (E.D.La. 1985). Since the presentation of these instruments to Baker for her signature was for the purpose of completing the transfer specifically prohibited by the TRO, Chambers' act of presentation, occurring as it did after his attorney's knowledge of the issuance of the TRO, was an absolute violation of that order.

■ On October 22, 1983 Rita Guillory, on behalf of CTR, lessee, executed a lease-back agreement and sent the agreement to Baker, the lessor, for her signature without any explanation whatsoever. The instrument covered the properties which had been conveyed by CTR to Baker on October 16, 1983 and provided for rental of $14,000 payable monthly in advance. This lease had two effects necessary to ratify and complete the alleged sale from CTR on October 16, 1983. It is an uncontroverted fact that delivery of possession of the properties to Baker was never made. This lease had the effect of giving Baker constructive possession of the properties as a lessor. It is also uncontroverted that the trust had no resources or income to pay the purchase price of 1.4 million dollars. This lease provided the only funds available to the trustee, Baker, for the payment of that consideration. Both of these effects are in aid of and necessary to the validity of the alleged sale of October 16, 1983. It is an uncontroverted fact that Chambers and CTR had personal knowledge and notice of issuance of the TRO prior to October 22, 1983. The execution of this lease by CTR at the direction of Chambers is an act in aid of and necessary to the validity of the deed executed by CTR on October 16, 1983. As such, this act is specifically prohibited under the TRO and is in absolute violation of that order.

■ 9. A simulated sale is an absolute nullity which conveys no title, and which may be set aside by the courts at any time, at the demand of any interested party. *Succession of Terral,* 312 So.2d 296, 299 (La.1975). The Public Records Doctrine cannot invest a simulation with substance and validity, and cannot protect it from rescission. *E.g., Smith v. Smith,* 239 La. 688, 119 So.2d 827, 832 (1960).

Louisiana law establishes a rebuttable presumption that a transaction is a simulation, and thus without substance or legal effect, under either of two circumstances.

■ The first occurs when the seller retains possession, under precarious title, of the property ostensibly sold. *Boagni v. Waterbury,* 403 So.2d 856, 859 (La.App. 3d Cir.1981); *Ingram v. Freeman,* 326 So.2d 565, 566 (La.App. 3d Cir.), *writ denied,* 329 So.2d 755 (La.1976), La.Civ.Code art. 2480.

*Presumption of simulation by retention of possession by seller.* In all cases where the thing sold remains in the possession of the seller, because he has reserved to himself the usufruct, or retains possession by a precarious title, there is reason to presume that the sale is simulated, and with respect to third persons, the parties must produce proof that they are acting in good faith, and establish the reality of the sale." La.Civ.Code art. 2480.

The second occurs when the party alleging the simulation shows circumstances which cast doubt or suspicion on the reality of the transaction. The classic "suspicious circumstances" identified by the courts of Louisiana would include: (1) conveyance to a close friend or relative; (2) timing close to an impending lawsuit, or other circumstances suggesting a desire to place the property out of reach; (3) lack of, or doubtful, consideration; (4) retention of possession by the seller; and (5) lack of inspection and knowledge of the property by the vendee. *See, e.g., Smith v. Smith, supra,* 119 So.2d at 831–32; *Williams v. Smith,* 340 So.2d 401, 402–03 (La.App. 3d Cir.

1976); *Ingram v. Freeman, supra,* 326 So.2d at 576–78; *Beatty v. Beatty,* 186 So.2d 855, 859–61 (La.App. 1st Cir.1966); *McDade v. Green,* 157 So. 275, 277–78 (La. App. 2d Cir.1934). All five of the classic circumstances occur in the instant sale.

We have noted previously, Finding of Fact 28, that the specially drawn duplicate deeds recite that the properties were delivered by CTR to Baker when, as we have already noted, no delivery was made. More significant is the fact that the duplicate deeds are given the more innocuous title "warranty deed" rather than the more precise title "cash sale", "credit sale" or "sale and mortgage". Consequently this leaves it up to any third-party examining the record to determine what type of sale is represented and thus what law is applicable to it. This is a cash sale because the consideration is recited in *dollars.* Not a note, *dollars.* Finding of Fact 25. The words "cash in hand paid, *receipt of which is hereby acknowledged"* or words of similar import are necessary as a certification by the signing vendor that he has received the purchase price. In this case no cash purchase price was ever paid. The signature of the purchaser can be omitted only in those instances where the vendor has delivered physical possession of the property and the purchaser has actually taken possession. *Megason v. Boleyn Lumber Co.,* 140 La. 431, 73 So. 257 (La.1916); *Franks v. Scott,* 191 So. 175 (La.App. 1st Cir.1939). It is well established here that no dollars (cash) were paid, that no possession was delivered. In the absence of delivery of possession to the purchaser, the purchaser's signature was necessary. That signature is absent. In fact there is no evidence the prospective trustee purchaser had assented to the sale at the time of recordation. The deeds are absolutely null, void and of no effect. Nor could they be ratified by the acts accomplished by Chambers and CTR after 1:34 p.m. October 17, 1985 as is shown elsewhere in this opinion.

For the above reasons we hold that the duplicate deeds executed by Rita Guillory on behalf of Calcasieu Television & Radio, Inc. on October 16, 1983 and recorded on October 17, 1983 in Conveyance Book 1771, p. 465, File No. 1774481 of the records of Calcasieu Parish, Louisiana and in Conveyance Book 561, p. 538, File No. 446829 of the records of Jefferson Davis Parish, Louisiana are null, void and of no effect.

■ 10. *Third-party purchaser under the Public Records Doctrine.* Under Louisiana law, there could be no valid sale without a purchaser who has knowledge of the transaction, who consents to the object sold and to the purchase price at the time of or prior to the execution of the instrument embodying the sale. La.Civ.C. art. 2456; *McDade v. Green,* 157 So. 275 (La.App. 2nd Cir.1934); La.Civ.Code art. 2456. Baker cannot qualify as a third party purchaser as contemplated under the Public Records Doctrine. That doctrine does not give validity to an invalid sale, it merely protects a valid sale. At the time of recordation Baker had no knowledge of the value, extent or location of the properties described in the alleged deeds, did not know the purchase price and had not consented to the alleged sale. She had not been consulted, she had no part in the negotiations leading up to the sale. In fact, she had no knowledge that the sale had taken place.

Chambers' own testimony at trial conclusively establishes that the trust was created and that Baker was vested as trustee, for the sole express purpose of generating a Public Records Doctrine defense to the specific enforcement of the agreement of August 9, 1983. A purchase literally created by his seller for the sole purpose of defeating the contractual rights of another cannot be considered a third-party purchase for the purpose of raising the Public Records Doctrine as a shield.

It is well established under Louisiana law that party interposed by his vendor for the express purpose of raising the Public Records Doctrine as a shield cannot be considered a third-party purchaser for that

reason. *Burns v. Jolley*, 153 La. 212, 95 So. 648 (La.1923). *See also First Nat'l Bank of Ruston v. Mercer*, 448 So.2d 1369 (La.App. 2nd Cir.1984).

■ 11. *Impracticability.* Specific performance in this instance is not impracticable. As shown above, the sale instrument as recorded was null, void and of no effect. That the entire series of transactions was a meaningless paper exchange between Chambers, Chambers (CTR), and Chambers (Baker); it was a checker game in which Chambers made all the moves for CTR and all the moves for Baker. He himself has admitted that all of it was done for the sole purpose of defeating specific performance of the agreement entered into by him and CTR with Nasco on August 9, 1983. All the acts done subsequent to the recordation of the sale and which might have the effect of ratifying, confirming or curing the deficiencies in that sale were done after the TRO became effective against the persons engaged in those acts are, therefore, in violation of that order and are subject to cancellation along with the deeds recorded on October 17, 1983.

## CONCLUSIONS

We find that Nasco is entitled to be restored to the status quo existing prior to the recordation of October 17, 1983 and to specific performance of the Agreement of August 9, 1983, and to judgment ordering that defendants Chambers and CTR perform expeditiously and in good faith all the obligations assumed by them in said Agreement; ordering further that Chambers and CTR file, on or before ten (10) days after judgment of this Court CTR's portion of the application to the FCC for the transfer of the license and the cooperation in good faith in proceedings before the FCC to achieve the transfer of license; ordering further that CTR produce and cancel the 1.4 million dollar note and deposit the cancelled note in the record of this proceeding on or before ten (10) days after judgment of this Court; ordering further that. the Clerks of Court of Calcasieu Parish and of Jefferson Davis Parish cancel and erase from the Conveyance Records of each parish the deed from CTR to Baker, Trustee, executed October 16, 1983 and the lease agreement executed by Baker, Trustee, on October 25, 1983 and by Rita Guillory on behalf of CTR on October 22, 1983; ordering further the performance of any and all other acts which may be necessary to restore the status quo prior to the recordation of October 17, 1983. Said order is to be binding on Chambers and CTR, their officers, agents, servants, employees and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

Plaintiff should submit a form of judgment in conformity with the above on or before ten (10) days from date hereof.