# CHAMBERS *v.* NASCO, INC.

No. 90–256.   Argued February 27, 1991—Decided June 6, 1991

34

*Mack E. Barham* argued the cause for petitioner. With him on the briefs were *Robert E. Arceneaux* and *Russell T. Tritico.*

*Joel I. Klein* argued the cause for respondent. With him on the brief were *Christopher D. Cerf, David A. Bono, Aubrey B. Harwell, Jr., Jon D. Ross, John B. Scofield,* and *David L. Hoskins.*

JUSTICE WHITE delivered the opinion of the Court.

This case requires us to explore the scope of the inherent power of a federal court to sanction a litigant for bad-faith conduct. Specifically, we are asked to determine whether the District Court, sitting in diversity, properly invoked its inherent power in assessing as a sanction for a party's bad-faith conduct attorney's fees and related expenses paid by the party's opponent to its attorneys. We hold that the District Court acted within its discretion, and we therefore affirm the judgment of the Court of Appeals.

I

This case began as a simple action for specific performance of a contract, but it did not remain so.[1] Petitioner G. Russell Chambers was the sole shareholder and director of Calcasieu Television and Radio, Inc. (CTR), which operated television station KPLC–TV in Lake Charles, Louisiana. On August 9, 1983, Chambers, acting both in his individual capacity and on behalf of CTR, entered into a purchase agree-

---

[1] The facts recited here are taken from the findings of the District Court, which were not disturbed by the Court of Appeals.

ment to sell the station's facilities and broadcast license to respondent NASCO, Inc., for a purchase price of $18 million. The agreement was not recorded in the parishes in which the two properties housing the station's facilities were located. Consummation of the agreement was subject to the approval of the Federal Communications Commission (FCC); both parties were obligated to file the necessary documents with the FCC no later than September 23, 1983.  By late August, however, Chambers had changed his mind and tried to talk NASCO out of consummating the sale.  NASCO refused. On September 23, Chambers, through counsel, informed NASCO that he would not file the necessary papers with the FCC.

NASCO decided to take legal action.  On Friday, October 14, 1983, NASCO's counsel informed counsel for Chambers and CTR that NASCO would file suit the following Monday in the United States District Court for the Western District of Louisiana, seeking specific performance of the agreement, as well as a temporary restraining order (TRO) to prevent the alienation or encumbrance of the properties at issue. NASCO provided this notice in accordance with Federal Rule of Civil Procedure 65 and Rule 11 of the District Court's Local Rules (now Rule 10), both of which are designed to give a defendant in a TRO application notice of the hearing and an opportunity to be heard.

The reaction of Chambers and his attorney, A. J. Gray III, was later described by the District Court as having "emasculated and frustrated the purposes of these rules and the powers of [the District] Court by utilizing this notice to prevent NASCO's access to the remedy of specific performance." *NASCO, Inc.* v. *Calcasieu Television & Radio, Inc.*, 623 F. Supp. 1372, 1383 (1985).  On Sunday, October 16, 1983, the pair acted to place the properties at issue beyond the reach of the District Court by means of the Louisiana Public Records Doctrine.  Because the purchase agreement had never been recorded, they determined that if the prop-

erties were sold to a third party, and if the deeds were recorded before the issuance of a TRO, the District Court would lack jurisdiction over the properties.

To this end, Chambers and Gray created a trust, with Chambers' sister as trustee and Chambers' three adult children as beneficiaries. The pair then directed the president of CTR, who later became Chambers' wife, to execute warranty deeds conveying the two tracts at issue to the trust for a recited consideration of $1.4 million dollars. Early Monday morning, the deeds were recorded. The trustee, as purchaser, had not signed the deeds; none of the consideration had been paid; and CTR remained in possession of the properties. Later that morning, NASCO's counsel appeared in the District Court to file the complaint and seek the TRO. With NASCO's counsel present, the District Judge telephoned Gray. Despite the judge's queries concerning the possibility that CTR was negotiating to sell the properties to a third person, Gray made no mention of the recordation of the deeds earlier that morning. *NASCO, Inc.* v. *Calcasieu Television & Radio, Inc.*, 124 F. R. D. 120, 126, n. 8 (1989). That afternoon, Chambers met with his sister and had her sign the trust documents and a $1.4 million note to CTR. The next morning, Gray informed the District Court by letter of the recordation of the deeds the day before and admitted that he had intentionally withheld the information from the court.

Within the next few days, Chambers' attorneys prepared a leaseback agreement from the trustee to CTR, so that CTR could remain in possession of the properties and continue to operate the station. The following week, the District Court granted a preliminary injunction against Chambers and CTR and entered a second TRO to prevent the trustee from alienating or encumbering the properties. At that hearing, the District Judge warned that Gray's and Chambers' conduct had been unethical.

Despite this early warning, Chambers, often acting through his attorneys, continued to abuse the judicial process. In November 1983, in defiance of the preliminary injunction, he refused to allow NASCO to inspect CTR's corporate records. The ensuing civil contempt proceedings resulted in the assessment of a $25,000 fine against Chambers personally. *NASCO, Inc.* v. *Calcasieu Television & Radio, Inc.*, 583 F. Supp. 115 (1984). Two subsequent appeals from the contempt order were dismissed for lack of a final judgment. See *NASCO, Inc.* v. *Calcasieu Television & Radio, Inc.*, No. 84–9037 (CA5, May 29, 1984); *NASCO, Inc.* v. *Calcasieu Television & Radio, Inc.*, 752 F. 2d 157 (CA5 1985).

Undeterred, Chambers proceeded with "a series of meritless motions and pleadings and delaying actions." 124 F. R. D., at 127. These actions triggered further warnings from the court. At one point, acting *sua sponte*, the District Judge called a status conference to find out why bankers were being deposed. When informed by Chambers' counsel that the purpose was to learn whether NASCO could afford to pay for the station, the court canceled the depositions consistent with its authority under Federal Rule of Civil Procedure 26(g).

At the status conference nine days before the April 1985 trial date,[2] the District Judge again warned counsel that further misconduct would not be tolerated.[3] Finally, on the eve of trial, Chambers and CTR stipulated that the purchase agreement was enforceable and that Chambers had breached the agreement on September 23, 1983, by failing to file the

---

[2] The trial date itself reflected delaying tactics. Trial had been set for February 1985, but in January, Gray, on behalf of Chambers, filed a motion to recuse the judge. The motion was denied, as was the subsequent writ of mandamus filed in the Court of Appeals.

[3] To make his point clear, the District Judge gave counsel copies of Judge Schwarzer's then-recent article, Sanctions Under the New Federal Rule 11—A Closer Look, 104 F. R. D. 181 (1985).

necessary papers with the FCC. At trial, the only defense presented by Chambers was the Public Records Doctrine.

In the interlude between the trial and the entry of judgment during which the District Court prepared its opinion, Chambers sought to render the purchase agreement meaningless by seeking permission from the FCC to build a new transmission tower for the station and to relocate the transmission facilities to that site, which was not covered by the agreement. Only after NASCO sought contempt sanctions did Chambers withdraw the application.

The District Court entered judgment on the merits in NASCO's favor, finding that the transfer of the properties to the trust was a simulated sale and that the deeds purporting to convey the property were "null, void, and of no effect." 623 F. Supp., at 1385. Chambers' motions, filed in the District Court, the Court of Appeals, and this Court, to stay the judgment pending appeal were denied. Undeterred, Chambers convinced CTR officials to file formal oppositions to NASCO's pending application for FCC approval of the transfer of the station's license, in contravention of both the District Court's injunctive orders and its judgment on the merits. NASCO then sought contempt sanctions for a third time, and the oppositions were withdrawn.

When Chambers refused to prepare to close the sale, NASCO again sought the court's help. A hearing was set for July 16, 1986, to determine whether certain equipment was to be included in the sale. At the beginning of the hearing, the court informed Chambers' new attorney, Edwin A. McCabe,[4] that further sanctionable conduct would not be tolerated. When the hearing was recessed for several days, Chambers, without notice to the court or NASCO, removed from service at the station all of the equipment at issue, forcing the District Court to order that the equipment be returned to service.

---

[4] Gray had resigned as counsel for Chambers and CTR several months previously.

Immediately following oral argument on Chambers' appeal from the District Court's judgment on the merits, the Court of Appeals, ruling from the bench, found the appeal frivolous. The court imposed appellate sanctions in the form of attorney's fees and double costs, pursuant to Federal Rule of Appellate Procedure 38, and remanded the case to the District Court with orders to fix the amount of appellate sanctions and to determine whether further sanctions should be imposed for the manner in which the litigation had been conducted. *NASCO, Inc.* v. *Calcasieu Television & Radio, Inc.*, 797 F. 2d 975 (CA5 1986) *(per curiam)* (unpublished order).

On remand, NASCO moved for sanctions, invoking the District Court's inherent power, Fed. Rule Civ. Proc. 11, and 28 U. S. C. § 1927. After full briefing and a hearing, see 124 F. R. D., at 141, n. 11, the District Court determined that sanctions were appropriate "for the manner in which this proceeding was conducted in the district court from October 14, 1983, the time that plaintiff gave notice of its intention to file suit to this date." *Id.*, at 123. At the end of an extensive opinion recounting what it deemed to have been sanctionable conduct during this period, the court imposed sanctions against Chambers in the form of attorney's fees and expenses totaling $996,644.65, which represented the entire amount of NASCO's litigation costs paid to its attorneys.[5]

---

[5] In calculating the award, the District Court deducted the amounts previously awarded as compensatory damages for contempt, as well as the amount awarded as appellate sanctions. 124 F. R. D., at 133–134.

The court also sanctioned other individuals, who are not parties to the action in this Court. Chambers' sister, the trustee, was sanctioned by a reprimand; attorney Gray was disbarred and prohibited from seeking readmission for three years; attorney Richard A. Curry, who represented the trustee, was suspended from practice before the court for six months; and attorney McCabe was suspended for five years. *Id.*, at 144–146. Although these sanctions did not affect the bank accounts of these individuals, they were nevertheless substantial sanctions and were as proportionate to the conduct at issue as was the monetary sanction imposed on

In so doing, the court rejected Chambers' argument that he had merely followed the advice of counsel, labeling him "the strategist," *id.*, at 132, behind a scheme devised "first, to deprive this Court of jurisdiction and, second, to devise a plan of obstruction, delay, harassment, and expense sufficient to reduce NASCO to a condition of exhausted compliance," *id.*, at 136.

In imposing the sanctions, the District Court first considered Federal Rule of Civil Procedure 11. It noted that the alleged sanctionable conduct was that Chambers and the other defendants had "(1) attempted to deprive this Court of jurisdiction by acts of fraud, nearly all of which were performed outside the confines of this Court, (2) filed false and frivolous pleadings, and (3) attempted, by other tactics of delay, oppression, harassment and massive expense to reduce plaintiff to exhausted compliance." 124 F. R. D., at 138. The court recognized that the conduct in the first and third categories could not be reached by Rule 11, which governs only papers filed with a court. As for the second category, the court explained that the falsity of the pleadings at issue did not become apparent until after the trial on the merits, so that it would have been impossible to assess sanctions at the time the papers were filed. *Id.*, at 138–139. Consequently, the District Court deemed Rule 11 "insufficient" for its purposes. *Id.*, at 139. The court likewise declined to impose sanctions under § 1927,[6] both because the statute applies only to attorneys, and therefore would not reach Chambers, and because the statute was not broad enough to reach "acts

---

Chambers. Indeed, in the case of the disbarment of attorney Gray, the court recognized that the penalty was among the harshest possible sanctions and one which derived from its authority to supervise those admitted to practice before it. See *id.*, at 140–141.

[6] That statute provides:

"Any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U. S. C. § 1927.

which degrade the judicial system," including "attempts to deprive the Court of jurisdiction, fraud, misleading and lying to the Court." *Ibid.* The court therefore relied on its inherent power in imposing sanctions, stressing that "[t]he wielding of that inherent power is particularly appropriate when the offending parties have practiced a fraud upon the court." *Ibid.*

The Court of Appeals affirmed. *NASCO, Inc.* v. *Calcasieu Television & Radio, Inc.*, 894 F. 2d 696 (CA5 1990). The court rejected Chambers' argument that a federal court sitting in diversity must look to state law, not the court's inherent power, to assess attorney's fees as a sanction for bad-faith conduct in litigation. The court further found that neither 28 U. S. C. § 1927 nor Federal Rule of Civil Procedure 11 limits a court's inherent authority to sanction bad-faith conduct "when the party's conduct is not within the reach of the rule or the statute."[7] 894 F. 2d, at 702–703. Although observing that the inherent power "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function," *id.*, at 702, the court also concluded that the District Court did not abuse its discretion in awarding to NASCO the fees and litigation costs paid to its attorneys. Because of the importance of these issues, we granted certiorari, 498 U. S. 807 (1990).

## II

Chambers maintains that 28 U. S. C. § 1927 and the various sanctioning provisions in the Federal Rules of Civil Procedure[8] reflect a legislative intent to displace the inherent

---

[7] The court remanded for a reconsideration of the proper sanction for attorney McCabe. 894 F. 2d, at 708.

[8] A number of the Rules provide for the imposition of attorney's fees as a sanction. See Fed. Rules Civ. Proc. 11 (certification requirement for papers), 16(f) (pretrial conferences), 26(g) (certification requirement for discovery requests), 30(g) (oral depositions), 37 (sanctions for failure to cooperate with discovery), 56(g) (affidavits accompanying summary judg-

power. At least, he argues that they obviate or foreclose resort to the inherent power in this case. We agree with the Court of Appeals that neither proposition is persuasive.

## A

It has long been understood that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." *United States* v. *Hudson*, 7 Cranch 32, 34 (1812); see also *Roadway Express, Inc.* v. *Piper*, 447 U. S. 752, 764 (1980) (citing *Hudson*). For this reason, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Anderson* v. *Dunn*, 6 Wheat. 204, 227 (1821); see also *Ex parte Robinson*, 19 Wall. 505, 510 (1874). These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link* v. *Wabash R. Co.*, 370 U. S. 626, 630–631 (1962).

Prior cases have outlined the scope of the inherent power of the federal courts. For example, the Court has held that a federal court has the power to control admission to its bar and to discipline attorneys who appear before it. See *Ex parte Burr*, 9 Wheat. 529, 531 (1824). While this power "ought to be exercised with great caution," it is nevertheless "incidental to all Courts." *Ibid.*

---

ment motions). In some instances, the assessment of fees is one of a range of possible sanctions, see, *e. g.*, Fed. Rule Civ. Proc. 11, while in others, the court must award fees, see, *e. g.*, Fed. Rule Civ. Proc. 16(f). In each case, the fees that may be assessed are limited to those incurred as a result of the Rule violation. In the case of Rule 11, however, a violation could conceivably warrant an imposition of fees covering the entire litigation, if, for example, a complaint or answer was filed in violation of the Rule. The court generally may act *sua sponte* in imposing sanctions under the Rules.

In addition, it is firmly established that "[t]he power to punish for contempts is inherent in all courts." *Robinson, supra,* at 510. This power reaches both conduct before the court and that beyond the court's confines, for "[t]he underlying concern that gave rise to the contempt power was not . . . merely the disruption of court proceedings. Rather, it was disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of trial." *Young* v. *United States ex rel. Vuitton et Fils S. A.,* 481 U. S. 787, 798 (1987) (citations omitted).

Of particular relevance here, the inherent power also allows a federal court to vacate its own judgment upon proof that a fraud has been perpetrated upon the court. See *Hazel-Atlas Glass Co.* v. *Hartford-Empire Co.,* 322 U. S. 238 (1944); *Universal Oil Products Co.* v. *Root Refining Co.,* 328 U. S. 575, 580 (1946). This "historic power of equity to set aside fraudulently begotten judgments," *Hazel-Atlas,* 322 U. S., at 245, is necessary to the integrity of the courts, for "tampering with the administration of justice in [this] manner . . . involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public." *Id.,* at 246. Moreover, a court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud. *Universal Oil, supra,* at 580.

There are other facets to a federal court's inherent power. The court may bar from the courtroom a criminal defendant who disrupts a trial. *Illinois* v. *Allen,* 397 U. S. 337 (1970). It may dismiss an action on grounds of *forum non conveniens, Gulf Oil Corp.* v. *Gilbert,* 330 U. S. 501, 507–508 (1947); and it may act *sua sponte* to dismiss a suit for failure to prosecute, *Link, supra,* at 630–631.

Because of their very potency, inherent powers must be exercised with restraint and discretion. See *Roadway Express, supra,* at 764. A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct

which abuses the judicial process. As we recognized in *Roadway Express,* outright dismissal of a lawsuit, which we had upheld in *Link,* is a particularly severe sanction, yet is within the court's discretion. 447 U. S., at 765. Consequently, the "less severe sanction" of an assessment of attorney's fees is undoubtedly within a court's inherent power as well. *Ibid.* See also *Hutto* v. *Finney,* 437 U. S. 678, 689, n. 14 (1978).

Indeed, "[t]here are ample grounds for recognizing . . . that in narrowly defined circumstances federal courts have inherent power to assess attorney's fees against counsel," *Roadway Express, supra,* at 765, even though the so-called "American Rule" prohibits fee shifting in most cases. See *Alyeska Pipeline Service Co.* v. *Wilderness Society,* 421 U. S. 240, 259 (1975). As we explained in *Alyeska,* these exceptions fall into three categories.[9] The first, known as the "common fund exception," derives not from a court's power to control litigants, but from its historic equity jurisdiction, see *Sprague* v. *Ticonic National Bank,* 307 U. S. 161, 164 (1939), and allows a court to award attorney's fees to a party whose litigation efforts directly benefit others. *Alyeska,* 421 U. S., at 257–258. Second, a court may assess attorney's fees as a sanction for the "'willful disobedience of a court order.'" *Id.,* at 258 (quoting *Fleischmann Distilling Corp.* v. *Maier Brewing Co.,* 386 U. S. 714, 718 (1967)). Thus, a court's discretion to determine "[t]he degree of punishment for contempt" permits the court to impose as part of the fine attorney's fees representing the entire cost of the litigation. *Toledo Scale Co.* v. *Computing Scale Co.,* 261 U. S. 399, 428 (1923).

Third, and most relevant here, a court may assess attorney's fees when a party has "'acted in bad faith, vexatiously,

---

[9] See also *Pennsylvania* v. *Delaware Valley Citizens' Council for Clean Air,* 478 U. S. 546, 561–562, and n. 6 (1986); *Summit Valley Industries, Inc.* v. *Carpenters,* 456 U. S. 717, 721 (1982); *F. D. Rich Co.* v. *United States ex rel. Industrial Lumber Co.,* 417 U. S. 116, 129–130 (1974).

wantonly, or for oppressive reasons.'" *Alyeska, supra,* at 258–259 (quoting *F. D. Rich Co.* v. *United States ex rel. Industrial Lumber Co.,* 417 U. S. 116, 129 (1974)). See also *Hall* v. *Cole,* 412 U. S. 1, 5 (1973); *Newman* v. *Piggie Park Enterprises, Inc.,* 390 U. S. 400, 402, n. 4 (1968) *(per curiam).* In this regard, if a court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled," it may assess attorney's fees against the responsible party, *Universal Oil, supra,* at 580, as it may when a party "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order,"[10] *Hutto,* 437 U. S., at 689, n. 14. The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of "vindicat[ing] judicial authority without resort to the more drastic sanctions available for contempt of court and mak[ing] the prevailing party whole for expenses caused by his opponent's obstinacy." *Ibid.*

## B

We discern no basis for holding that the sanctioning scheme of the statute and the rules displaces the inherent power to impose sanctions for the bad-faith conduct described above. These other mechanisms, taken alone or together, are not substitutes for the inherent power, for that power is both broader and narrower than other means of imposing sanctions. First, whereas each of the other mechanisms reaches only certain individuals or conduct, the inherent power extends to a full range of litigation abuses. At the very least, the inherent power must continue to exist to fill in the interstices. Even JUSTICE KENNEDY's dissent so

---

[10] In this regard, the bad-faith exception resembles the third prong of Rule 11's certification requirement, which mandates that a signer of a paper filed with the court warrant that the paper "is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation."

concedes. See *post*, at 64. Second, while the narrow exceptions to the American Rule effectively limit a court's inherent power to impose attorney's fees as a sanction to cases in which a litigant has engaged in bad-faith conduct or willful disobedience of a court's orders, many of the other mechanisms permit a court to impose attorney's fees as a sanction for conduct which merely fails to meet a reasonableness standard. Rule 11, for example, imposes an objective standard of reasonable inquiry which does not mandate a finding of bad faith.[11] See *Business Guides, Inc.* v. *Chromatic Communications Enterprises, Inc.*, 498 U. S. 533, 548–549 (1991).

It is true that the exercise of the inherent power of lower federal courts can be limited by statute and rule, for "[t]hese courts were created by act of Congress." *Robinson*, 19 Wall., at 511. Nevertheless, "we do not lightly assume that Congress has intended to depart from established principles" such as the scope of a court's inherent power. *Weinberger* v. *Romero-Barcelo*, 456 U. S. 305, 313 (1982); see also *Link*, 370 U. S., at 631–632. In *Alyeska* we determined that "Congress ha[d] not repudiated the judicially fashioned exceptions" to the American Rule, which were founded in the inherent power of the courts. 421 U. S., at 260. Nothing since then has changed that assessment,[12] and we have thus

---

[11] Indeed, Rule 11 was amended in 1983 precisely because the subjective bad-faith standard was difficult to establish and courts were therefore reluctant to invoke it as a means of imposing sanctions. See Advisory Committee's Notes on 1983 Amendment to Rule 11, 28 U. S. C. App., pp. 575–576. Consequently, there is little risk that courts will invoke their inherent power "to chill the advocacy of litigants attempting to vindicate all other important federal rights." See *post*, at 68 (KENNEDY, J., dissenting). To the extent that such a risk does exist, it is no less present when a court invokes Rule 11. See *Cooter & Gell* v. *Hartmarx Corp.*, 496 U. S. 384, 393 (1990).

[12] Chambers also asserts that all inherent powers are not created equal. Relying on *Eash* v. *Riggins Trucking Inc.*, 757 F. 2d 557, 562–563 (CA3 1985) (en banc), he suggests that inherent powers fall into three tiers: (1)

48

reaffirmed the scope and the existence of the exceptions since the most recent amendments to § 1927 and Rule 11, the other sanctioning mechanisms invoked by NASCO here. See *Pennsylvania* v. *Delaware Valley Citizens' Council for Clean Air,* 478 U. S. 546, 561–562, and n. 6 (1986). As the Court of Appeals recognized, 894 F. 2d, at 702, the amendment to § 1927 allowing an assessment of fees against an attorney says nothing about a court's power to assess fees against a party. Likewise, the Advisory Committee's Notes on the 1983 Amendment to Rule 11, 28 U. S. C. App., p. 575, declare that the Rule "build[s] upon and expand[s] the equitable doctrine permitting the court to award expenses, including attorney's fees, to a litigant whose opponent acts in bad faith in instituting or conducting litigation," citing as support this Court's decisions in *Roadway Express* and *Hall.*[13] Thus, as the Court of Appeals for the Ninth Circuit has recognized, Rule 11 "does not repeal or modify existing authority of federal courts to deal with abuses . . . under the court's

irreducible powers derived from Article III, which exist despite contrary legislative direction; (2) essential powers that arise from the nature of the court, which can be legislatively regulated but not abrogated; and (3) powers that are necessary only in the sense of being useful, which exist absent legislation to the contrary. Brief for Petitioner 17. Chambers acknowledges that this Court has never so classified the inherent powers, and we have no need to do so now. Even assuming, *arguendo,* that the power to shift fees falls into the bottom tier of this alleged hierarchy of inherent powers, Chambers' argument is unavailing, because we find no legislative intent to limit the scope of this power.

[13] The Advisory Committee's Notes on the 1983 Amendments to other Rules reflect a similar intent to preserve the scope of the inherent power. While the Notes to Rule 16, 28 U. S. C. App., p. 591, point out that the sanctioning provisions are designed "to obviate dependence upon Rule 41(b) or the court's inherent power," there is no indication of an intent to displace the inherent power, but rather simply to provide courts with an additional tool by which to control the judicial process. The Notes to Rule 26(g), 28 U. S. C. App., p. 622, point out that the rule "makes explicit the authority judges now have to impose appropriate sanctions and requires them to use it. This authority derives from Rule 37, 28 U. S. C. § 1927, and the court's inherent power." (Citations omitted.)

inherent power." *Zaldivar* v. *Los Angeles*, 780 F. 2d 823, 830 (1986).

The Court's prior cases have indicated that the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct. In *Link*, it was recognized that a federal district court has the inherent power to dismiss a case *sua sponte* for failure to prosecute, even though the language of Federal Rule of Civil Procedure 41(b) appeared to require a motion from a party:

> "The authority of a court to dismiss *sua sponte* for lack of prosecution has generally been considered an 'inherent power,' governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. That it has long gone unquestioned is apparent not only from the many state court decisions sustaining such dismissals, but even from language in this Court's opinion in *Redfield* v. *Ystalyfera Iron Co.*, 110 U. S. 174, 176. It also has the sanction of wide usage among the District Courts. It would require a much clearer expression of purpose than Rule 41(b) provides for us to assume that it was intended to abrogate so well-acknowledged a proposition." 370 U. S., at 630–632 (footnotes omitted).

In *Roadway Express*, a party failed to comply with discovery orders and a court order concerning the schedule for filing briefs. 447 U. S., at 755. After determining that §1927, as it then existed, would not allow for the assessment of attorney's fees, we remanded the case for a consideration of sanctions under *both* Federal Rule of Civil Procedure 37 *and* the court's inherent power, while recognizing that invocation of the inherent power would require a finding of bad faith.[14] *Id.*, at 767.

---

[14] The decision in *Societe Internationale pour Participations Industrielles et Commerciales, S. A.* v. *Rogers*, 357 U. S. 197 (1958), is not to the

There is, therefore, nothing in the other sanctioning mechanisms or prior cases interpreting them that warrants a conclusion that a federal court may not, as a matter of law, resort to its inherent power to impose attorney's fees as a sanction for bad-faith conduct. This is plainly the case where the conduct at issue is not covered by one of the other sanctioning provisions. But neither is a federal court forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules. A court must, of course, exercise caution in invoking its inherent power, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees, see *Roadway Express, supra*, at 767. Furthermore, when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power.

Like the Court of Appeals, we find no abuse of discretion in resorting to the inherent power in the circumstances of this case. It is true that the District Court could have employed Rule 11 to sanction Chambers for filing "false and frivolous pleadings," 124 F. R. D., at 138, and that some of the other conduct might have been reached through other Rules. Much of the bad-faith conduct by Chambers, however, was

---

contrary. There it was held that the Court of Appeals had erred in relying on the District Court's inherent power and Rule 41(b), rather than Federal Rule of Civil Procedure 37(b)(2)(iii), in dismissing a complaint for a plaintiff's failure to comply with a discovery order. Because Rule 37 dealt specifically with discovery sanctions, *id.*, at 207, there was "no need" to resort to Rule 41(b), which pertains to trials, or to the court's inherent power, *ibid.* Moreover, because individual rules address specific problems, in many instances it might be improper to invoke one when another directly applies. Cf. *Zaldivar* v. *Los Angeles*, 780 F. 2d 823, 830 (CA9 1986).

beyond the reach of the Rules; his entire course of conduct throughout the lawsuit evidenced bad faith and an attempt to perpetrate a fraud on the court, and the conduct sanctionable under the Rules was intertwined within conduct that only the inherent power could address. In circumstances such as these in which all of a litigant's conduct is deemed sanctionable, requiring a court first to apply Rules and statutes containing sanctioning provisions to discrete occurrences before invoking inherent power to address remaining instances of sanctionable conduct would serve only to foster extensive and needless satellite litigation, which is contrary to the aim of the Rules themselves. See, *e. g.,* Advisory Committee's Notes on 1983 Amendment to Rule 11, 28 U. S. C. App., pp. 575–576.

We likewise do not find that the District Court's reliance on the inherent power thwarted the purposes of the other sanctioning mechanisms. Although JUSTICE KENNEDY's dissent makes much of the fact that Rule 11 and Rule 26(g) "are cast in mandatory terms," *post,* at 66, the mandate of these provisions extends only to *whether* a court must impose sanctions, not to *which* sanction it must impose. Indeed, the language of both Rules requires only that a court impose "an appropriate sanction." Thus, this case is distinguishable from *Bank of Nova Scotia* v. *United States,* 487 U. S. 250 (1988), in which this Court held that a district court could not rely on its supervisory power as a means of circumventing the clear mandate of a procedural rule. *Id.,* at 254–255.

### III

Chambers asserts that even if federal courts can use their inherent power to assess attorney's fees as a sanction in some cases, they are not free to do so when they sit in diversity, unless the applicable state law recognizes the "bad-faith" exception to the general rule against fee shifting. He relies on footnote 31 in *Alyeska,* in which we stated with regard to the exceptions to the American Rule that "[a] very different situ-

ation is presented when a federal court sits in a diversity case. '[I]n an ordinary diversity case where the state law does not run counter to a valid federal statute or rule of court, and usually it will not, state law denying the right to attorney's fees or giving a right thereto, which reflects a substantial policy of the state, should be followed.' 6 J. Moore, Federal Practice ¶ 54.77[2], pp. 1712–1713 (2d ed. 1974) (footnotes omitted)." 421 U. S., at 259, n. 31.

We agree with NASCO that Chambers has misinterpreted footnote 31. The limitation on a court's inherent power described there applies only to fee-shifting rules that embody a substantive policy, such as a statute which permits a prevailing party in certain classes of litigation to recover fees. That was precisely the issue in *Sioux County* v. *National Surety Co.*, 276 U. S. 238 (1928), the only case cited in footnote 31. There, a state statute mandated that in actions to enforce an insurance policy, the court was to award the plaintiff a reasonable attorney's fee. See *id.*, at 242, and n. 2. In enforcing the statute, the Court treated the provision as part of a statutory liability which created a substantive right. *Id.*, at 241–242. Indeed, *Alyeska* itself concerned the substantive nature of the public policy choices involved in deciding whether vindication of the rights afforded by a particular statute is important enough to warrant the award of fees. See 421 U. S., at 260–263.

Only when there is a conflict between state and federal substantive law are the concerns of *Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938), at issue. As we explained in *Hanna* v. *Plumer*, 380 U. S. 460 (1965), the "outcome determinative" test of *Erie* and *Guaranty Trust Co.* v. *York*, 326 U. S. 99 (1945), "cannot be read without reference to the twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws." 380 U. S., at 468. Despite Chambers' protestations to the contrary, neither of these twin aims is implicated by the assessment of attorney's fees as a sanction for bad-faith conduct before the

court which involved disobedience of the court's orders and the attempt to defraud the court itself. In our recent decision in *Business Guides, Inc.* v. *Chromatic Communications Enterprises, Inc.*, 498 U. S., at 553, we stated, "Rule 11 sanctions do not constitute the kind of fee shifting at issue in *Alyeska* [because they] are not tied to the outcome of litigation; the relevant inquiry is whether a specific filing was, if not successful, at least well founded." Likewise, the imposition of sanctions under the bad-faith exception depends not on which party wins the lawsuit, but on how the parties conduct themselves during the litigation. Consequently, there is no risk that the exception will lead to forum-shopping. Nor is it inequitable to apply the exception to citizens and noncitizens alike, when the party, by controlling his or her conduct in litigation, has the power to determine whether sanctions will be assessed. As the Court of Appeals expressed it: *"Erie* guarantees a litigant that if he takes his state law cause of action to federal court, and abides by the rules of that court, the result in his case will be the same as if he had brought it in state court. It does not allow him to waste the court's time and resources with cantankerous conduct, even in the unlikely event a state court would allow him to do so." 894 F. 2d, at 706.

As Chambers has recognized, see Brief for Petitioner 15, in the case of the bad-faith exception to the American Rule, "the underlying rationale of 'fee shifting' is, of course, punitive." *Hall*, 412 U. S., at 4–5. Cf. *Pavelic & LeFlore* v. *Marvel Entertainment Group*, 493 U. S. 120, 126 (1989). "[T]he award of attorney's fees for bad faith serve[s] the same purpose as a remedial fine imposed for civil contempt," because "[i]t vindicate[s] the District Court's authority over a recalcitrant litigant." *Hutto*, 437 U. S., at 691. "That the award ha[s] a compensatory effect does not in any event distinguish it from a fine for civil contempt, which also compen-

sates a private party for the consequences of a contemnor's disobedience." [15]  *Id.*, at 691, n. 17.

Chambers argues that because the primary purpose of the sanction is punitive, assessing attorney's fees violates the State's prohibition on punitive damages.   Under Louisiana law, there can be no punitive damages for breach of contract, even when a party has acted in bad faith in breaching the agreement.   *Lancaster* v. *Petroleum Corp. of Delaware*, 491 So. 2d 768, 779 (La. App. 1986).   Cf. La. Civ. Code Ann., Art. 1995 (West 1987).   Indeed, "as a general rule attorney's fees are not allowed a successful litigant in Louisiana except where authorized by statute or by contract."   *Rutherford* v. *Impson*, 366 So. 2d 944, 947 (La. App. 1978).   It is clear, though, that this general rule focuses on the award of attorney's fees because of a party's success on the underlying claim.   Thus, in *Frank L. Beier Radio, Inc.* v. *Black Gold Marine, Inc.*, 449 So. 2d 1014 (La. 1984), the state court considered the scope of a statute which permitted an award of attorney's fees in a suit seeking to collect on an open account. *Id.*, at 1015.   This substantive state policy is not implicated here, where sanctions were imposed for conduct during the litigation.

Here, the District Court did not attempt to sanction petitioner for breach of contract,[16] but rather imposed sanctions for the fraud he perpetrated on the court and the bad faith he displayed toward both his adversary and the court throughout the course of the litigation.[17]   See 124 F. R. D., at 123,

---

[15] Consequently, Chambers' reformulated argument in his reply brief that the primary purpose of a fee shift under the bad-faith exception "has always been compensatory," Reply Brief for Petitioner 15–16, fails utterly.

[16] We therefore express no opinion as to whether the District Court would have had the inherent power to sanction Chambers for conduct relating to the underlying breach of contract, or whether such sanctions might implicate the concerns of *Erie*.

[17] Contrary to Chambers' assertion, the District Court did not sanction him for failing to file the requisite papers with the FCC in September 1983, although the District Court did find that this conduct was a deliberate

143.   We agree with the Court of Appeals that "[w]e do not see how the district court's inherent power to tax fees for that conduct can be made subservient to any state policy without transgressing the boundaries set out in *Erie, Guaranty Trust Co.*, and *Hanna*," for "[f]ee-shifting here is not a matter of substantive remedy, but of vindicating judicial authority."   894 F. 2d, at 705.

## IV

We review a court's imposition of sanctions under its inherent power for abuse of discretion.   *Link*, 370 U. S., at 633; see also *Cooter & Gell* v. *Hartmarx Corp.*, 496 U. S. 384, 399–405 (1990) (Rule 11).   Based on the circumstances of this case, we find that the District Court acted within its discretion in assessing as a sanction for Chambers' bad-faith conduct the entire amount of NASCO's attorney's fees.

Relying on cases imposing sanctions under Rule 11,[18] Chambers proffers five criteria for imposing attorney's fees as a sanction under a court's inherent power, and argues that the District Court acted improperly with regard to each of

---

violation of the agreement and was done "in absolute bad faith," 124 F. R. D., at 125.   As the court noted, "the allegedly sanctionable acts were committed in the conduct and trial of the very proceeding in which sanctions [were] sought," *id.*, at 141, n. 11, and thus the sanctions imposed "appl[ied] only to sanctionable acts which occurred in connection with the proceedings in the trial Court," *id.*, at 143.   Although the fraudulent transfer of assets took place before the suit was filed, it occurred after Chambers was given notice, pursuant to court rule, of the pending suit. Consequently, the sanctions imposed on Chambers were aimed at punishing not only the harm done to NASCO, but also the harm done to the court itself.   Indeed, the District Court made clear that it was policing abuse of its own process when it imposed sanctions "for the manner in which this proceeding was conducted in the district court from October 14, 1983, the time that plaintiff gave notice of its intention to file suit." *Id.*, at 123.

[18] See, *e. g.*, *In re Kunstler*, 914 F. 2d 505 (CA4 1990), cert. denied, 499 U. S. 969 (1991); *White* v. *General Motors Corp.*, 908 F. 2d 675 (CA10 1990); *Thomas* v. *Capital Security Services, Inc.*, 836 F. 2d 866 (CA5 1988) (en banc).

them. First, he asserts that sanctions must be timely in order to have the desired deterrent effect, and that the post-judgment sanction imposed here fails to achieve that aim. As NASCO points out, however, we have made clear that, even under Rule 11, sanctions may be imposed years after a judgment on the merits.[19] *Id.*, at 395–396. Interrupting the proceedings on the merits to conduct sanctions hearings may serve only to reward a party seeking delay. More importantly, while the sanction was not assessed until the conclusion of the litigation, Chambers received repeated timely warnings both from NASCO and the court that his conduct was sanctionable. Cf. *Thomas* v. *Capital Security Services, Inc.*, 836 F. 2d 866, 879–881 (CA5 1988) (en banc). Consequently, the District Court's reliance on the inherent power did not represent an end run around the notice requirements of Rule 11. The fact that Chambers obstinately refused to be deterred does not render the District Court's action an abuse of discretion.

Second, Chambers claims that the fact that the entire amount of fees was awarded means that the District Court failed to tailor the sanction to the particular wrong. As NASCO points out, however, the District Court concluded that full attorney's fees were warranted due to the frequency and severity of Chambers' abuses of the judicial system and the resulting need to ensure that such abuses were not repeated.[20] Indeed, the court found Chambers' actions were

---

[19] Cf. Advisory Committee Notes on 1983 Amendment to Rule 11, 28 U. S. C. App., p. 576 ("The time when sanctions are to be imposed rests in the discretion of the trial judge. However, it is anticipated that in the case of pleadings the sanctions issue under Rule 11 normally will be determined at the end of the litigation, and in the case of motions at the time when the motion is decided or shortly thereafter").

[20] In particular, Chambers challenges the assessment of attorney's fees in connection with NASCO's claim for delay damages and with the closing of the sale. As NASCO points out, however, Chambers' bad-faith conduct in the course of the litigation caused the delay for which damages were

"part of [a] sordid scheme of deliberate misuse of the judicial process" designed "to defeat NASCO's claim by harassment, repeated and endless delay, mountainous expense and waste of financial resources." 124 F. R. D., at 128. It was within the court's discretion to vindicate itself and compensate NASCO by requiring Chambers to pay for all attorney's fees. Cf. *Toledo Scale*, 261 U. S., at 428.

Third, Chambers maintains that the District Court abused its discretion by failing to require NASCO to mitigate its expenses. He asserts that had NASCO sought summary disposition of the case, the litigation could have been concluded much sooner. But, as NASCO notes, Chambers himself made a swift conclusion to the litigation by means of summary judgment impossible by continuing to assert that material factual disputes existed.

Fourth, Chambers challenges the District Court's imposition of sanctions for conduct before other tribunals, including the FCC, the Court of Appeals, and this Court, asserting that a court may sanction only conduct occurring in its presence. Our cases are to the contrary, however. As long as a party receives an appropriate hearing, as did Chambers, see 124 F. R. D., at 141, n. 11, the party may be sanctioned for abuses of process occurring beyond the courtroom, such as disobeying the court's orders. See *Young*, 481 U. S., at 798; *Toledo Scale, supra*, at 426–428. Here, for example, Chambers' attempt to gain the FCC's permission to build a new transmission tower was in direct contravention of the District Court's orders to maintain the status quo pending the outcome of the litigation and was therefore within the scope of the District Court's sanctioning power.

Finally, Chambers claims the award is not "personalized," because the District Court failed to conduct any inquiry into whether he was personally responsible for the challenged conduct. This assertion is flatly contradicted by the District

---

sought and greatly complicated the closing of the sale, through the cloud on the title caused by the fraudulent transfer.

Court's detailed factual findings concerning Chambers' involvement in the sequence of events at issue. Indeed, the court specifically held that "the extraordinary amount of costs and expenses expended in this proceeding were caused not by lack of diligence or any delays in the trial of this matter by NASCO, NASCO's counsel or the Court, but solely by the relentless, repeated fraudulent and brazenly unethical efforts of Chambers" and the others. 124 F. R. D., at 136. The Court of Appeals saw no reason to disturb this finding. 894 F. 2d, at 706. Neither do we.

For the foregoing reasons, the judgment of the Court of Appeals for the Fifth Circuit is

*Affirmed.*

JUSTICE SCALIA, dissenting.

I agree with the Court that Article III courts, as an independent and coequal Branch of Government, derive from the Constitution itself, once they have been created and their jurisdiction established, the authority to do what courts have traditionally done in order to accomplish their assigned tasks. Some elements of that inherent authority are so essential to "[t]he judicial Power," U. S. Const., Art. III, § 1, that they are indefeasible, among which is a court's ability to enter orders protecting the integrity of its proceedings.

> "Certain implied powers must necessarily result to our Courts of justice from the nature of their institution. . . . To fine for contempt—imprison for contumacy—inforce the observance of order, &c. are powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others: and so far our Courts no doubt possess powers not immediately derived from statute . . . ." *United States* v. *Hudson,* 7 Cranch 32, 34 (1812).

I think some explanation might be useful regarding the "bad-faith" limitation that the Court alludes to today, see *ante,* at 47. Since necessity does not depend upon a liti-

gant's state of mind, the inherent sanctioning power must extend to situations involving less than bad faith. For example, a court has the power to dismiss when counsel fails to appear for trial, even if this is a consequence of negligence rather than bad faith.

> "The authority of a court to dismiss *sua sponte* for lack of prosecution has generally been considered an 'inherent power,' governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link* v. *Wabash R. Co.*, 370 U. S. 626, 630–631 (1962).

However, a "bad-faith" limitation upon the particular sanction of attorney's fees derives from our jurisprudence regarding the so-called American Rule, which provides that the prevailing party must bear his own attorney's fees and cannot have them assessed against the loser. See *Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U. S. 240, 247 (1975). That rule, "deeply rooted in our history and in congressional policy," *id.*, at 271, prevents a court (without statutory authorization) from engaging in what might be termed *substantive* fee shifting, that is, fee shifting as part of the merits award. It does not in principle bar fee shifting as a sanction for procedural abuse, see *id.*, at 258–259. We have held, however—in my view as a means of preventing erosion or evasion of the American Rule—that even fee shifting as a sanction can only be imposed for litigation conduct characterized by bad faith. See *Roadway Express, Inc.* v. *Piper*, 447 U. S. 752, 766 (1980). But that in no way means that *all* sanctions imposed under the courts' inherent authority require a finding of bad faith. They do not. See *Redfield* v. *Ystalyfera Iron Co.*, 110 U. S. 174, 176 (1884) (dismissal appropriate for unexcused delay in prosecution); cf. *Link*, *supra*.

Just as Congress may to some degree specify the manner in which the inherent or constitutionally assigned powers of

the President will be exercised, so long as the effectiveness of those powers is not impaired, cf. *Myers* v. *United States*, 272 U. S. 52, 128 (1926), so also Congress may prescribe the means by which the courts may protect the integrity of their proceedings. A court must use the prescribed means unless for some reason they are inadequate. In the present case they undoubtedly were. JUSTICE KENNEDY concedes that some of the impairments of the District Court's proceedings in the present case were not sanctionable under the Federal Rules. I have no doubt of a court's authority to go beyond the Rules in such circumstances. And I agree with the Court that an overall sanction resting at least in substantial portion upon the court's inherent power need not be broken down into its component parts, with the actions sustainable under the Rules separately computed. I do not read the Rules at issue here to require that, and it is unreasonable to import such needless complication by implication.

I disagree, however, with the Court's statement that a court's inherent power reaches conduct "beyond the court's confines" that does not "'interfer[e] with the conduct of trial,'" *ante*, at 44 (quoting *Young* v. *United States ex rel. Vuitton et Fils S. A.*, 481 U. S. 787, 798 (1987)). See *id.*, at 819–822 (SCALIA, J., concurring in judgment); *Bank of Nova Scotia* v. *United States*, 487 U. S. 250, 264 (1988) (SCALIA, J., concurring). I emphatically agree with JUSTICE KENNEDY, therefore, that the District Court here had no power to impose any sanctions for petitioner's flagrant, bad-faith breach of contract; and I agree with him that it appears to have done so. For that reason, I dissent.

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE and JUSTICE SOUTER join, dissenting.

Today's decision effects a vast expansion of the power of federal courts, unauthorized by Rule or statute. I have no doubt petitioner engaged in sanctionable conduct that warrants severe corrective measures. But our outrage at his

conduct should not obscure the boundaries of settled legal categories.

With all respect, I submit the Court commits two fundamental errors. First, it permits the exercise of inherent sanctioning powers without prior recourse to controlling Rules and statutes, thereby arrogating to federal courts Congress' power to regulate fees and costs. Second, the Court upholds the wholesale shift of respondent's attorney's fees to petitioner, even though the District Court opinion reveals that petitioner was sanctioned at least in part for his so-called bad-faith breach of contract. The extension of inherent authority to sanction a party's prelitigation conduct subverts the American Rule and turns the *Erie* doctrine upside down by punishing petitioner's primary conduct contrary to Louisiana law. Because I believe the proper exercise of inherent powers requires exhaustion of express sanctioning provisions and much greater caution in their application to redress prelitigation conduct, I dissent.

## I

The Court's first error lies in its failure to require reliance, when possible, on the panoply of express sanctioning provisions provided by Congress.

## A

The American Rule prohibits federal courts from awarding attorney's fees in the absence of a statute or contract providing for a fee award. *Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U. S. 240, 258–259 (1975). The Rule recognizes that Congress defines the procedural and remedial powers of federal courts, *Sibbach* v. *Wilson & Co.*, 312 U. S. 1, 9–10 (1941); *McIntire* v. *Wood*, 7 Cranch 504, 505–506 (1813), and controls the costs, sanctions, and fines available there, *Kaiser Aluminum & Chemical Corp.* v. *Bonjorno*, 494 U. S. 827, 835 (1990) ("[T]he allocation of the costs accruing from litigation is a matter for the legislature, not the courts"); *Alyeska Pipeline Co.*, *supra*, at 262 ("[T]he circum-

stances under which attorney's fees are to be awarded and the range of discretion of the courts in making those awards are matters for Congress to determine").

By direct action and delegation, Congress has exercised this constitutional prerogative to provide district courts with a comprehensive arsenal of Federal Rules and statutes to protect themselves from abuse. A district court can punish contempt of its authority, including disobedience of its process, by fine or imprisonment, 18 U. S. C. § 401; award costs, expenses, and attorney's fees against attorneys who multiply proceedings vexatiously, 28 U. S. C. § 1927; sanction a party and/or the party's attorney for filing groundless pleadings, motions, or other papers, Fed. Rule Civ. Proc. 11; sanction a party and/or his attorney for failure to abide by a pretrial order, Fed. Rule Civ. Proc. 16(f); sanction a party and/or his attorney for baseless discovery requests or objections, Fed. Rule Civ. Proc. 26(g); award expenses caused by a failure to attend a deposition or to serve a subpoena on a party to be deposed, Fed. Rule Civ. Proc. 30(g); award expenses when a party fails to respond to discovery requests or fails to participate in the framing of a discovery plan, Fed. Rules Civ. Proc. 37(d) and (g); dismiss an action or claim of a party that fails to prosecute, to comply with the Federal Rules, or to obey an order of the court, Fed. Rule Civ. Proc. 41(b); punish any person who fails to obey a subpoena, Fed. Rule Civ. Proc. 45(f); award expenses and/or contempt damages when a party presents an affidavit in a summary judgment motion in bad faith or for the purpose of delay, Fed. Rule Civ. Proc. 56(g); and make rules governing local practice that are not inconsistent with the Federal Rules, Fed. Rule Civ. Proc. 81. See also 28 U. S. C. § 1912 (power to award just damages and costs on affirmance); Fed. Rule App. Proc. 38 (power to award damages and costs for frivolous appeal).

The Court holds nonetheless that a federal court may ignore these provisions and exercise inherent power to sanction bad-faith misconduct "even if procedural rules exist which

sanction the same conduct." *Ante*, at 49. The Court describes the relation between express sanctioning provisions and inherent power to shift fees as a sanction for bad-faith conduct in a number of ways. At one point it states that where "neither the statute nor the Rules are up to the task [*i. e.*, cover all the sanctionable conduct], the court may safely rely on its inherent power." *Ante*, at 50. At another it says that courts may place exclusive reliance on inherent authority whenever "conduct sanctionable under the Rules was intertwined within conduct that only the inherent power could address." *Ante*, at 51. While the details of the Court's rule remain obscure, its general approach is clear: When express Rules and statutes provided by Congress do not reach the entirety of a litigant's bad-faith conduct, including conduct occurring before litigation commenced, a district court may disregard the requirements of otherwise applicable Rules and statutes and instead exercise inherent power to impose sanctions. The only limitation on this sanctioning authority appears to be a finding at some point of "bad faith," a standard the Court fails to define.

This explanation of the permitted sphere of inherent powers to shift fees as a sanction for bad-faith litigation conduct is as illegitimate as it is unprecedented. The American Rule recognizes that the Legislature, not the Judiciary, possesses constitutional responsibility for defining sanctions and fees; the bad-faith exception to the Rule allows courts to assess fees not provided for by Congress "in narrowly defined circumstances." *Roadway Express, Inc.* v. *Piper*, 447 U. S. 752, 765 (1980). By allowing courts to ignore express Rules and statutes on point, however, the Court treats inherent powers as the norm and textual bases of authority as the exception. And although the Court recognizes that Congress in theory may channel inherent powers through passage of sanctioning Rules, it relies on *Weinberger* v. *Romero-Barcelo*, 456 U. S. 305 (1982), a decision that has nothing to do with

inherent authority, to create a powerful presumption against congressional control of judicial sanctions. *Ante*, at 47.

The Court has the presumption backwards. Inherent powers are the exception, not the rule, and their assertion requires special justification in each case. Like all applications of inherent power, the authority to sanction bad-faith litigation practices can be exercised only when necessary to preserve the authority of the court. See *Roadway Express, Inc.* v. *Piper, supra,* at 764 (inherent powers "are those which 'are necessary to the exercise of all others'"); *Young* v. *United States ex rel. Vuitton et Fils S. A.,* 481 U. S. 787, 819–820 (1987) (SCALIA, J., concurring in judgment) (inherent powers only those "necessary to permit the courts to function").

The necessity limitation, which the Court brushes aside almost without mention, *ante*, at 43, prescribes the rule for the correct application of inherent powers. Although this case does not require articulation of a comprehensive definition of the term "necessary," at the very least a court need not exercise inherent power if Congress has provided a mechanism to achieve the same end. Consistent with our unaltered admonition that inherent powers must be exercised "with great caution," *Ex parte Burr*, 9 Wheat. 529, 531 (1824), the necessity predicate limits the exercise of inherent powers to those exceptional instances in which congressionally authorized powers fail to protect the processes of the court. Inherent powers can be exercised only when necessary, and there is no necessity if a Rule or statute provides a basis for sanctions. It follows that a district court should rely on text-based authority derived from Congress rather than inherent power in every case where the text-based authority applies.

Despite the Court's suggestion to the contrary, *ante*, at 48–49, our cases recognize that Rules and statutes limit the exercise of inherent authority. In *Societe Internationale pour Participations Industrielles et Commerciales, S. A.* v. *Rog-*

*ers*, 357 U. S. 197 (1958), we rejected the Court of Appeals' reliance on inherent powers to uphold a dismissal of a complaint for failure to comply with a production order. Noting that "[r]eliance upon . . . 'inherent power' can only obscure analysis of the problem," we held that "whether a court has power to dismiss a complaint because of non-compliance with a production order depends exclusively upon Rule 37." *Id.*, at 207. Similarly, in *Bank of Nova Scotia* v. *United States*, 487 U. S. 250, 254 (1988), we held that a federal court could not invoke its inherent supervisory power to circumvent the harmless-error inquiry prescribed by Federal Rule of Criminal Procedure 52(a). And *Ex parte Robinson*, 19 Wall. 505 (1874), the very case the Court cites for the proposition that "'[t]he power to punish for contempts is inherent in all courts,'" *ante*, at 44, held that Congress had defined and limited this inherent power through enactment of the contempt statute. "The enactment is a limitation upon the manner in which the [contempt] power shall be exercised." 19 Wall., at 512.

The Court ignores these rulings and relies instead on two decisions which "indicat[e] that the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Ante*, at 49. The "indications" the Court discerns in these decisions do not withstand scrutiny. In *Roadway Express, Inc.* v. *Piper*, *supra*, we held that the costs recoverable under a prior version of 28 U. S. C. § 1927 for discovery abuse did not include attorney's fees. In the remand instruction, the Court mentioned that the District Court might consider awarding attorney's fees under either Federal Rule of Civil Procedure 37 or its inherent authority to sanction bad-faith litigation practices. 447 U. S., at 767–768. The decision did not discuss the relation between Rule 37 and the inherent power of federal courts, and certainly did not suggest that federal courts could rely on inherent powers to the exclusion of a Federal Rule on point.

The Court also misreads *Link* v. *Wabash R. Co.*, 370 U. S. 626 (1962). *Link* held that a Federal District Court possessed inherent power to dismiss a case *sua sponte* for failure to prosecute. The majority suggests that this holding contravened a prior version of Federal Rule of Civil Procedure 41(b), which the Court today states "appeared to *require* a motion from a party," *ante*, at 49 (emphasis added). Contrary to the Court's characterization, the holding in *Link* turned on a determination that Rule 41(b) contained "*permissive* language . . . which merely authorizes a motion by the defendant*," 370 U. S., at 630 (emphasis added). *Link* reasoned that "[n]either the permissive language of the Rule . . . nor its policy" meant that the Rule "abrogate[d]" the inherent power of federal courts to dismiss *sua sponte*. The permissive language at issue in *Link* distinguishes it from the present context, because some sanctioning provisions, such as Rules 11 and 26(g), are cast in mandatory terms.

In addition to dismissing some of our precedents and misreading others, the Court ignores the commands of the Federal Rules of Civil Procedure, which support the conclusion that a court should rely on rules, and not inherent powers, whenever possible. Like the Federal Rules of Criminal Procedure, the Federal Rules of Civil Procedure are "as binding as any statute duly enacted by Congress, and federal courts have no more discretion to disregard the Rule[s'] mandate than they do to disregard constitutional or statutory provisions." *Bank of Nova Scotia* v. *United States, supra*, at 255. See also Fed. Rule Civ. Proc. 1 (Federal Rules "*govern* the procedure in the United States district courts in *all* suits of a civil nature") (emphasis added). Two of the most prominent sanctioning provisions, Rules 11 and 26(g), mandate the imposition of sanctions when litigants violate the Rules' certification standards. See Fed. Rule Civ. Proc. 11 (court "shall impose . . . an appropriate sanction" for violation of certification standard); Fed. Rule Civ. Proc. 26(g) (same); see also *Business Guides, Inc.* v. *Chromatic Communications Enter-*

*prises, Inc.*, 498 U. S. 533, 543 (1991) (Rule 11 "requires that sanctions be imposed where a signature is present but fails to satisfy the certification standard").

The Rules themselves thus reject the contention that they may be discarded in a court's discretion. Disregard of applicable Rules also circumvents the rulemaking procedures in 28 U. S. C. § 2071 *et seq.*, which Congress designed to assure that procedural innovations like those announced today "shall be introduced only after mature consideration of informed opinion from all relevant quarters, with all the opportunities for comprehensive and integrated treatment which such consideration affords." *Miner* v. *Atlass*, 363 U. S. 641, 650 (1960).

## B

Upon a finding of bad faith, courts may now ignore any and all textual limitations on sanctioning power. By inviting district courts to rely on inherent authority as a substitute for attention to the careful distinctions contained in the Rules and statutes, today's decision will render these sources of authority superfluous in many instances. A number of pernicious practical effects will follow.

The Federal Rules establish explicit standards for, and explicit checks against, the exercise of judicial authority. Rule 11 provides a useful illustration. It requires a district court to impose reasonable sanctions, including attorney's fees, when a party or attorney violates the certification standards that attach to the signing of certain legal papers. A district court must (rather than may) issue sanctions under Rule 11 when particular individuals (signers) file certain types (groundless, unwarranted, vexatious) of documents (pleadings, motions and papers). Rule 11's certification requirements apply to all signers of documents, including represented parties, see *Business Guides, Inc.* v. *Chromatic Communications Enterprises, Inc.*, *supra*, but law firms are not responsible for the signatures of their attorneys, see *Pavelic & LeFlore* v. *Marvel Entertainment Group*, 493 U. S.

120, 125–127 (1989), and the Rule does not apply to papers filed in fora other than district courts, see *Cooter & Gell* v. *Hartmarx Corp.*, 496 U. S. 384, 405–409 (1990). These definite standards give litigants notice of proscribed conduct and make possible meaningful review for misuse of discretion—review which focuses on the misapplication of legal standards. See *id.*, at 402 (misuse of discretion standard does "not preclude the appellate court's correction of a district court's legal errors").

By contrast, courts apply inherent powers without specific definitional or procedural limits. True, if a district court wishes to shift attorney's fees as a sanction, it must make a finding of bad faith to circumvent the American Rule. But today's decision demonstrates how little guidance or limitation the undefined bad-faith predicate provides. The Court states without elaboration that courts must "comply with the mandates of due process . . . in determining that the requisite bad faith exists," *ante*, at 50, but the Court's bad-faith standard, at least without adequate definition, thwarts the first requirement of due process, namely, that "[a]ll are entitled to be informed as to what the State commands or forbids." *Lanzetta* v. *New Jersey*, 306 U. S. 451, 453 (1939). This standardless exercise of judicial power may appear innocuous in this litigation between commercial actors. But the same unchecked power also can be applied to chill the advocacy of litigants attempting to vindicate all other important federal rights.

In addition, the scope of sanctionable conduct under the bad-faith rule appears unlimited. As the Court boasts, "whereas each of the other mechanisms [in Rules and statutes] reaches only certain individuals or conduct, the inherent power extends to a full range of litigation abuses." *Ante*, at 46. By allowing exclusive resort to inherent authority whenever "conduct sanctionable under the Rules was intertwined within conduct that only the inherent power could address," *ante*, at 51, the Court encourages all courts

in the federal system to find bad-faith misconduct in order to eliminate the need to rely on specific textual provisions. This will ensure the uncertain development of the meaning and scope of these express sanctioning provisions by encouraging their disuse, and will defeat, at least in the area of sanctions, Congress' central goal in enacting the Federal Rules—"'uniformity in the federal courts.'" *Hanna* v. *Plumer*, 380 U. S. 460, 472 (1965). Finally, as Part IV of the Court's opinion demonstrates, the lack of any legal requirement other than the talismanic recitation of the phrase "bad faith" will foreclose meaningful review of sanctions based on inherent authority. See *Cooter & Gell* v. *Hartmarx Corp.*, *supra*, at 402.

Despite these deficiencies, the Court insists that concern about collateral litigation requires courts to place exclusive reliance on inherent authority in cases, like this one, which involve conduct sanctionable under both express provisions and inherent authority:

> "In circumstances such as these in which all of a litigant's conduct is deemed santionable, requiring a court first to apply Rules and statutes containing sanctioning provisions to discrete occurrences before invoking inherent power to address remaining instances of sanctionable conduct would serve only to foster extensive and needless satellite litigation, which is contrary to the aim of the Rules themselves." *Ante*, at 51.

We are bound, however, by the Rules themselves, not their "aim," and the Rules require that they be applied, in accordance with their terms, to much of the conduct in this case. We should not let policy concerns about the litigation effects of following the Rules distort their clear commands.

Nothing in the foregoing discussion suggests that the fee-shifting and sanctioning provisions in the Federal Rules and Title 28 eliminate the inherent power to impose sanctions for certain conduct. Limitations on a power do not constitute its abrogation. Cases can arise in which a federal court must

act to preserve its authority in a manner not provided for by the Federal Rules or Title 28. But as the number and scope of Rules and statutes governing litigation misconduct increase, the necessity to resort to inherent authority—a predicate to its proper application—lessens. Indeed, it is difficult to imagine a case in which a court can, as the District Court did here, rely on inherent authority as the exclusive basis for sanctions.

### C

The District Court's own findings concerning abuse of its processes demonstrate that the sanctionable conduct in this case implicated a number of Rules and statutes upon which it should have relied. Rule 11 is the principal provision on point. The District Court found that petitioner and his counsel filed a number of "frivolous pleadings" (including "baseless, affirmative defenses and counterclaims") that contained "deliberate untruths and fabrications." *NASCO, Inc.* v. *Calcasieu Television & Radio, Inc.*, 124 F. R. D. 120, 127–128, 135 (WD La. 1989). Rule 11 sanctions extend to "the person who signed [a paper], a represented party, or both." The court thus had a nondefeasible duty to impose sanctions under Rule 11.

The Court concedes that Rule 11 applied to some of the conduct in this case, *ante*, at 50, and even hints that the Rule might have sufficed as a basis for all of the sanctions imposed, *ante*, at 42, n. 8. It fails to explain, however, why the District Court had the discretion to ignore Rule 11's mandatory language and not impose sanctions under the Rule against Chambers. Nor does the Court inform us why Chambers' attorneys were not sanctioned under Rule 11. Although the District Court referred to Chambers as the "strategist" for the abusive conduct, it made plain that petitioner's attorneys as well as petitioner were responsible for the tactics. For example, the District Court stated:

> "[Petitioner's] attorneys, without any investigation whatsoever, filed [the baseless charges and counter-

claims]. We find . . . that these attorneys knew, at the time that they were filed, that they were false." 124 F. R. D., at 128.

The court further stressed that "Chambers, through his attorneys, filed answers and counterclaims . . . which both Chambers and his attorneys knew were false at the time they were filed." *Id.*, at 143. In light of Rule 11's mandatory language, the District Court had a duty to impose at least some sanctions under Rule 11 against Chambers' attorneys.

The District Court should have relied as well upon other sources of authority to impose sanctions. The court found that Chambers and his attorneys requested "[a]bsolutely needless depositions" as well as "continuances of trial dates, extensions of deadlines and deferments of scheduled discovery" that "were simply part of the sordid scheme of deliberate misuse of the judicial process . . . to defeat NASCO's claim by harassment, repeated and endless delay, mountainous expense and waste of financial resources." *Id.*, at 128. The intentional pretrial delays could have been sanctioned under Federal Rule of Civil Procedure 16(f), which enables courts to impose sanctions, including attorney's fees, when a party or attorney "fails to participate in good faith" in certain pretrial proceedings; the multiple discovery abuses should have been redressed by "an appropriate sanction, . . . including a reasonable attorney's fee," under Federal Rule of Civil Procedure 26(g). The District Court also could have sanctioned Chambers and his attorneys for the various bad-faith affidavits they presented in their summary judgment motions, see 124 F. R. D., at 128, 135, under Federal Rule of Civil Procedure 56(g), a Rule that permits the award of expenses and attorney's fees and the additional sanction of contempt. In addition, the District Court could have relied to a much greater extent on 18 U. S. C. § 401 to punish the "contempt of its authority" and "[d]isobedience . . . to its . . . process" that petitioner and his counsel displayed throughout the proceedings.

Finally, the District Court was too quick to dismiss reliance on 28 U. S. C. § 1927, which allows it to award costs and attorney's fees against an "attorney . . . who . . . multiplies the proceedings in any case unreasonably and vexatiously." The District Court refused to apply the provision because it did not reach petitioner's conduct as a nonattorney. 124 F. R. D., at 138–139. While the District Court has discretion not to apply § 1927, it cannot disregard the statute in the face of attorney misconduct covered by that provision to rely instead on inherent powers which by definition can be invoked only when necessary.

## II

When a District Court imposes sanctions so immense as here under a power so amorphous as inherent authority, it must ensure that its order is confined to conduct under its own authority and jurisdiction to regulate. The District Court failed to discharge this obligation, for it allowed sanctions to be awarded for petitioner's prelitigation breach of contract. The majority, perhaps wary of the District Court's authority to extend its inherent power to sanction prelitigation conduct, insists that "the District Court did not attempt to sanction petitioner for breach of contract, but rather imposed sanctions for the fraud he perpetrated on the court and the bad faith he displayed toward both his adversary and the court throughout the course of the litigation." *Ante*, at 54 (footnote omitted). Based on this premise, the Court appears to disclaim that its holding reaches prelitigation conduct. *Ante*, at 54, and nn. 16–17. This does not make the opinion on this point correct, of course, for the District Court's opinion, in my view, sanctioned petitioner's prelitigation conduct in express terms. Because I disagree with the Court's characterization of the District Court opinion, and because I believe the Court's casual analysis of inherent authority portends a dangerous extension of that authority to prelitigation conduct, I explain why inherent

authority should not be so extended and why the District Court's order should be reversed.

The District Court's own candid and extensive opinion reveals that the bad faith for which petitioner was sanctioned extended beyond the litigation tactics and comprised as well what the District Court considered to be bad faith in refusing to perform the underlying contract three weeks before the lawsuit began. The court made explicit reference, for instance, to "this massive and absolutely unnecessary lawsuit forced on NASCO by Chambers' arbitrary and arrogant refusal to honor and perform this perfectly legal and enforceable contract." 124 F. R. D., at 136. See also *id.*, at 143 ("Chambers arbitrarily and without legal cause refused to perform, forcing NASCO to bring its suit for specific performance"); *ibid.* ("Chambers, knowing that NASCO had a good and valid contract, hired Gray to find a defense and arbitrarily refused to perform, thereby forcing NASCO to bring its suit for specific performance and injunctive relief"); *id.*, at 125 (petitioner's "unjustified and arbitrary refusal to file" the FCC application "was in absolute bad faith"). The District Court makes the open and express concession that it is sanctioning petitioner for his breach of contract:

> "[T]he balance of . . . fees and expenses included in the sanctions, would not have been incurred by NASCO if Chambers had not defaulted and forced NASCO to bring this suit. There is absolutely no reason why Chambers should not reimburse in full all attorney's fees and expenses that NASCO, by Chambers' action, was forced to pay." *Id.*, at 143.

The trial court also explained that "[t]he attorney's fees and expenses charged to NASCO by its attorneys . . . *flowed from and were a direct result of this suit*. We shall include them in the attorney's fees sanctions." *Id.*, at 142 (emphasis added).

Despite the Court's equivocation on the subject, *ante,* at
54, n. 16, it is impermissible to allow a District Court acting
pursuant to its inherent authority to sanction such prelitiga-
tion primary conduct.    A court's inherent authority extends
only to remedy abuses of the judicial process.    By contrast,
awarding damages for a violation of a legal norm, here the
binding obligation of a legal contract, is a matter of substan-
tive law, see *Marek* v. *Chesny,* 473 U. S. 1, 35 (1985) ("right
to attorney's fees is 'substantive' under any reasonable defini-
tion of that term"); see also *Alyeska,* 421 U. S., at 260–261,
and n. 33, which must be defined either by Congress (in cases
involving federal law) or by the States (in diversity cases).

The American Rule recognizes these principles.    It bars a
federal court from shifting fees as a matter of substantive
policy, but its bad-faith exception permits fee shifting as a
sanction to the extent necessary to protect the judicial proc-
ess.    The Rule protects each person's right to go to federal
court to define and to vindicate substantive rights.    "[S]ince
litigation is at best uncertain one should not be penalized for
merely defending or prosecuting a lawsuit." *Fleischmann
Distilling Corp.* v. *Maier Brewing Co.,* 386 U. S. 714, 718
(1967).    When a federal court, through invocation of its in-
herent powers, sanctions a party for bad-faith prelitigation
conduct, it goes well beyond the exception to the American
Rule and violates the Rule's careful balance between open ac-
cess to the federal court system and penalties for the willful
abuse of it.

By exercising inherent power to sanction prelitigation con-
duct, the District Court exercised authority where Congress
gave it none.    The circumstance that this exercise of power
occurred in a diversity case compounds the error.    When a
federal court sits in diversity jurisdiction, it lacks constitu-
tional authority to fashion rules of decision governing pri-
mary contractual relations.    See *Erie R. Co.* v. *Tompkins,*
304 U. S. 64, 78 (1938); *Hanna* v. *Plumer,* 380 U. S., at
471–472.    See generally Ely, The Irrepressible Myth of *Erie,*

87 Harv. L. Rev. 693, 702–706 (1974).  The *Erie* principle recognizes that "[e]xcept in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any [diversity] case is the law of the State."  304 U. S., at 78.  The inherent power exercised here violates the fundamental tenet of federalism announced in *Erie* by regulating primary behavior that the Constitution leaves to the exclusive province of States.

The full effect of the District Court's encroachment on state prerogatives can be appreciated by recalling that the rationale for the bad-faith exception is punishment.  *Hall* v. *Cole*, 412 U. S. 1, 5 (1973).  To the extent that the District Court imposed sanctions by reason of the so-called bad-faith breach of contract, its decree is an award of punitive damages for the breach.  Louisiana prohibits punitive damages "unless expressly authorized by statute," *International Harvester Credit Corp.* v. *Seale*, 518 So. 2d 1039, 1041 (La. 1988); and no Louisiana statute authorizes attorney's fees for breach of contract as a part of damages in an ordinary case, *Ogea* v. *Loffland Brothers Co.*, 622 F. 2d 186, 190 (CA5 1980); *Rutherford* v. *Impson*, 366 So. 2d 944, 947 (La. App. 1978).  One rationale for Louisiana's policy is its determination that "an award of compensatory damages will serve the same deterrent purpose as an award of punitive damages."  *Ricard* v. *State*, 390 So. 2d 882, 886 (La. 1980).  If respondent had brought this suit in state court it would not have recovered extra damages for breach of contract by reason of the so-called willful character of the breach.  Respondent's decision to bring this suit in federal rather than state court resulted in a significant expansion of the substantive scope of its remedy.  This is the result prohibited by *Erie* and the principles that flow from it.

As the Court notes, there are some passages in the District Court opinion suggesting its sanctions were confined to litigation conduct.  See *ante*, at 55, n. 17.  ("[T]he sanctions imposed 'appl[ied] only to sanctionable acts which occurred in

connection with the proceedings in the trial Court'"). But these passages in no way contradict the other statements by the trial court which make express reference to prelitigation conduct. At most, these passages render the court's order ambiguous, for the District Court appears to have adopted an expansive definition of "acts which occurred in connection with" the litigation. There is no question but that some sanctionable acts did occur in court. The problem is that the District Court opinion avoids any clear delineation of the acts being sanctioned and the power invoked to do so. This confusion in the premises of the District Court's order highlights the mischief caused by reliance on undefined inherent powers rather than on Rules and statutes that proscribe particular behavior. The ambiguity of the scope of the sanctionable conduct cannot be resolved against petitioner alone, who, despite the conceded bad-faith conduct of his attorneys, has been slapped with all of respondent's not inconsiderable attorney's fees. At the very least, adherence to the rule of law requires the case to be remanded to the District Court for clarification on the scope of the sanctioned conduct.

## III

My discussion should not be construed as approval of the behavior of petitioner and his attorneys in this case. Quite the opposite. Our Rules permit sanctions because much of the conduct of the sort encountered here degrades the profession and disserves justice. District courts must not permit this abuse and must not hesitate to give redress through the Rules and statutes prescribed. It may be that the District Court could have imposed the full million dollar sanction against petitioner through reliance on Federal Rules and statutes, as well as on a proper exercise of its inherent authority. But we should remand here because a federal court must decide cases based on legitimate sources of power. I would reverse the Court of Appeals with instructions to re-

mand to the District Court for a reassessment of sanctions consistent with the principles here set forth. For these reasons, I dissent.